

U.S. Department of Justice

Jeanine Ferris Pirro
United States Attorney

*District of Columbia*

Judiciary Center
601 D St. N.W.
Washington, D.C.  20530

June 16, 2025

**<u>VIA ELECTRONIC MAIL</u>**
Sim Hyon Sop
Hajim610@gmail.com

      **Re:**    **NOTICE OF CIVIL FORFEITURE ACTION, 25-CV-1769**

Dear Sir/Madam:

The United States Attorney's Office for the District of Columbia filed a Verified Complaint for Forfeiture *In Rem* on June 5, 2025, against the property identified as:

**VIRTUAL CURRENCY ASSOCIATED WITH NORTH KOREAN IT WORKER MONEY LAUNDERING AND SANCTIONS EVASION CONSPIRACIES**

Enclosed you will find the Notice of Civil Forfeiture Action, Verified Complaint, Part 9 of Title 28 of the Code of Federal Regulations, and a blank Petition for Remission.

      Sincerely,

      Jeanine Ferris Pirro
      ACTING UNITED STATES ATTORNEY

      */s/ Rick Blaylock, Jr.*
      Rick Blaylock, Jr.
      Assistant United States Attorney
      Asset Forfeiture Coordinator
      United States Attorney's Office
      601 D Street, N.W.
      Washington, D.C. 20001
      (202) 252-6765

Enclosures

| | |
|---|---|
| **From:** | Blaylock Jr, Rick (USADC) |
| **To:** | Hajim610@gmail.com |
| **Subject:** | Notice of Forfeiture Action: 25-CV-1769; UNITED STATES OF AMERICA vs VIRTUAL CURRENCY ASSOCIATED WITH NORTH KOREAN IT WORKER MONEY LAUNDERING AND SANCTIONS EVASION CONSPIRACIES |
| **Date:** | Monday, June 16, 2025 7:21:15 PM |
| **Attachments:** | Notice Package_Sim Hyon Sop_06162025.pdf |

Good evening,

Attached is a notice of forfeiture action against Virtual Currency Associated with North Korean It Worker Money Laundering and Sanctions Evasion Conspiracies seized by the United States government. Please email confirmation upon receipt.

Thank you!


Rick Blaylock
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
District of Columbia
Desk: (202) 252-6765
Cell: (202) 803-1627

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    )
U.S. Attorney's Office    )
601 D Street, NW    )
Washington, DC 20001,    )
    )
    Plaintiff,    )
    )
    v.    )    Civil A. No. 25-cv-1769
    )
VIRTUAL CURRENCY ASSOCIATED    )
WITH NORTH KOREAN IT WORKER    )
MONEY LAUNDERING AND SANCTIONS    )
EVASION CONSPIRACIES,    )
    )
    Defendant.    )

**NOTICE OF JUDICIAL FORFEITURE ACTION**

On June 5, 2025, the United States Attorney for the District of Columbia filed a Verified

Complaint for Forfeiture in the United States District Court for the District of Columbia against:

**VIRTUAL CURRENCY ASSOCIATED WITH NORTH KOREAN IT WORKER MONEY
LAUNDERING AND SANCTIONS EVASION CONSPIRACIES**

This lawsuit is brought under 18 U.S.C. §§ 1343, 1349, 2, and 3, and a conspiracy to commit

these offenses, in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 2, and 3.

Therefore, this property is subject to forfeiture to the United States.

Pursuant to 18 U.S.C. § 983 and Rule G(4)(b) of the Supplemental Rules for Admiralty or

Maritime Claims and Asset Forfeiture Actions, direct notice of this action along with a copy of the

verified complaint, is being sent by FedEx mail.

1

Any party who intends to assert an interest in any defendant property and contest the forfeiture in court must file a verified Claim in the United States District Court, District of Columbia, 333 Constitution Avenue, NW, Washington, D.C. 20001 under case title listed above, 25-cv-1769, **within 35 days** of the Government sending this Notice, in accordance with Supplemental Rule G(5). A corporate entity must be represented by a lawyer in order to file a proper verified Claim. Additionally, claimants must serve and file Answers to the Complaint, or motions under Rule 12 of the Federal Rules of Civil Procedure, **within 21** days after filing their verified Claims.

Claims must comply with Supplemental Rule G(5)(a) and Claims and Answers are to be filed with the Clerk, United States District Court for the District of Columbia at the above address, with a copy thereof served on the undersigned Assistant United States Attorney at the address listed below.

Alternatively, any party who intends to seek the return of property may file a petition for remission or mitigation. A petition for remission or mitigation is considered by the Department of Justice, and not the Court. The petition process is further detailed in the attached Code of Federal Regulations. A petition for remission or mitigation must be submitted within **30 days** of the date notice is received. A sample petition is enclosed in this notice packet.

2

The filing of a petition does not serve as a substitute for filing a claim; nor does the filing

of a claim serve as a substitute for filing a petition.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765


June 16, 2025

3

CODE OF FEDERAL REGULATIONS
TITLE 28--JUDICIAL ADMINISTRATION
CHAPTER I--DEPARTMENT OF JUSTICE
PART 9--REGULATIONS GOVERNING THE REMISSION OR MITIGATION OF CIVIL
AND CRIMINAL FORFEITURES

§ 9.1 Authority, purpose, and scope.

§ 9.2 Definitions.

§ 9.3 Petitions in administrative forfeiture cases.

§ 9.4 Petitions in judicial forfeiture cases.

§ 9.5 Criteria governing administrative and judicial remission and mitigation.

§ 9.6 Special rules for specific petitioners.

§ 9.7 Terms and conditions of remission and mitigation.

§ 9.8 Provisions applicable to victims.

§ 9.9 Miscellaneous Provisions.

### § 9.1 Authority, purpose, and scope.

(a) Purpose. This part sets forth the procedures for agency officials to follow when considering remission or mitigation of administrative forfeitures under the jurisdiction of the agency, and civil judicial and criminal judicial forfeitures under the jurisdiction of the Criminal Division. The purpose of the regulations in this part is to provide a basis for ameliorating the effects of forfeiture through the partial or total remission of forfeiture for individuals who have an interest in the forfeited property but who did not participate in, or have knowledge of, the conduct that resulted in the property being subject to forfeiture and, where required, took all reasonable steps under the circumstances to ensure that such property would not be used, acquired, or disposed of contrary to law. Additionally, the regulations provide for partial or total mitigation of the forfeiture and imposition of alternative conditions in appropriate circumstances.

(b) Authority to grant remission and mitigation.

(1) Remission and mitigation functions in administrative forfeitures are performed by the agency seizing the property. Within the Federal Bureau of Investigation, authority to grant remission and mitigation is delegated to the Forfeiture Counsel, who is the Unit Chief, Legal Forfeiture Unit, Office of the General Counsel; within the Drug Enforcement Administration, authority to grant remission and mitigation is delegated to the Forfeiture Counsel, Office of Chief Counsel; and within the Immigration and Naturalization Service, authority to grant remission and mitigation is delegated to the INS Regional Directors.

(2) Remission and mitigation functions in judicial cases are performed by the Criminal Division of the Department of Justice. Within the Criminal Division, authority to grant remission and mitigation is delegated to the Chief, Asset Forfeiture and Money Laundering Section, Criminal Division.

(3) The powers and responsibilities delegated by these regulations in this part may be redelegated to attorneys or managers working under the supervision of the designated officials.

(c) The time periods and internal requirements established in this part are designed to guide the orderly administration of the remission and mitigation process and are not intended to create rights or entitlements in favor of individuals seeking remission or mitigation. The regulations will apply to all decisions on petitions for remission or mitigation made on or after February 3, 1997. The regulations will apply to decisions on requests for reconsideration of a denial of a petition under §§ 9.3(j) and 9.4(k) only if the initial decision on the petition was made under the provisions of this part effective on February 3, 1997.

(d) This part governs any petition for remission filed with the Attorney General and supersedes any Department of Justice regulation governing petitions for remission, to the extent such regulation is inconsistent with this part. In particular, this part supersedes the provisions of 21 CFR 1316.79 and 1316.80, which contain remission and mitigation procedures for property seized for narcotics violations. The provisions of 8 CFR 274.13 through 274.19 and 28 CFR 8.10, which concern non-drug related forfeitures, are also superseded by this part where those regulations relate to remission and mitigation.

### § 9.2 Definitions.

As used in this part:

(a) The term administrative forfeiture means the process by which property may be forfeited by an investigative agency rather than through judicial proceedings.

(b) The term appraised value means the estimated market value of an asset at the time and place of seizure if such or similar property was freely offered for sale between a willing seller and a willing buyer.

(c) The term Assets Forfeiture Fund means the Department of Justice Assets Forfeiture Fund or Department of the Treasury Asset Forfeiture Fund, depending upon the identity of the seizing agency.

(d) The term Attorney General means the Attorney General of the United States or his or her designee.

(e) The term beneficial owner means a person with actual use of, as well as an interest in, the property subject to forfeiture.

(f) The terms Chief, Asset Forfeiture and Money Laundering Section, and Chief, refer to the Chief of the Asset Forfeiture and Money Laundering Section, Criminal Division, United States Department of Justice.

(g) The term general creditor means one whose claim or debt is not secured by a specific right to obtain satisfaction against the particular property subject to forfeiture.

(h) The term judgment creditor means one who has obtained a judgment against the debtor but has not yet received full satisfaction of the judgment.

(i) The term judicial forfeiture means either a civil or a criminal proceeding in a United States District Court that may result in a final judgment and order of forfeiture.

(j) The term lienholder means a creditor whose claim or debt is secured by a specific right to obtain satisfaction against the particular property subject to forfeiture. A lien creditor qualifies as a lienholder

if the lien:

(1) Was established by operation of law or contract;

(2) Was created as a result of an exchange of money, goods, or services; and

(3) Is perfected against the specific property forfeited for which remission or mitigation is sought (e.g., a real estate mortgage; a mechanic's lien).

(k) The term net equity means the amount of a lienholder's monetary interest in property subject to forfeiture. Net equity shall be computed by determining the amount of unpaid principal and unpaid interest at the time of seizure, and by adding to that sum unpaid interest calculated from the date of seizure through the last full month prior to the date of the decision on the petition. Where a rate of interest is set forth in a security agreement, the rate of interest to be used in this computation will be the annual percentage rate so specified in the security agreement that is the basis of the lienholder's interest. In this computation, however, there shall be no allowances for attorneys' fees, accelerated or enhanced interest charges, amounts set by contract as damages, unearned extended warranty fees, insurance, service contract charges incurred after the date of seizure, allowances for dealer's reserve, or any other similar charges.

(l) The term owner means the person in whom primary title is vested or whose interest is manifested by the actual and beneficial use of the property, even though the title is vested in another. A victim of an offense, as defined in paragraph (v) of this section, may also be an owner if he or she has a present legally cognizable ownership interest in the property forfeited. A nominal owner of property will not be treated as its true owner if he or she is not its beneficial owner.

(m) The term person means an individual, partnership, corporation, joint business enterprise, estate, or other legal entity capable of owning property.

(n) The term petition means a petition for remission or mitigation of forfeiture under the regulations in this part. This definition includes a petition for restoration of the proceeds of sale of forfeited property and a petition for the value of forfeited property placed into official use.

(o) The term petitioner means the person applying for remission, mitigation, restoration of the proceeds of sale, or for the appraised value of forfeited property, under the regulations in this part. A petitioner may be an owner as defined in § 9.2(l), a lienholder as defined in § 9.2(j), or a victim as defined in § 9.2(v), subject to the limitations of § 9.8.

(p) The term property means real or personal property of any kind capable of being owned or possessed.

(q) The term record means a series of arrests for related crimes, unless the arrestee was acquitted or the charges were dismissed for lack of evidence; a conviction for a related crime or completion of sentence within ten years of the acquisition of the property subject to forfeiture; or two convictions for a related crime at any time in the past.

(r) The term related crime as used in § 9.2(q) and § 9.6(e) means any crime similar in nature to that which gives rise to the seizure of property for forfeiture. For example, where property is seized for a violation of the federal laws relating to drugs, a related crime would be any offense involving a violation of the federal laws relating to drugs or the laws of any state or political subdivision thereof relating to drugs.

(s) The term related offense as used in § 9.8 means:

(1) Any predicate offense charged in a Federal Racketeer Influenced and Corrupt Organizations Act (RICO) count for which forfeiture was ordered;  or

(2) An offense committed as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered.

(t) The term Ruling Official means any official to whom decision making authority has been delegated pursuant to § 9.1(b).

(u) The term seizing agency means the federal agency that seized the property or adopted the seizure of another agency for federal forfeiture.

(v) The term victim means a person who has incurred a pecuniary loss as a direct result of the commission of the offense underlying a forfeiture.  A drug user is not considered a victim of a drug trafficking offense under this definition.  A victim does not include one who acquires a right to sue the perpetrator of the criminal offense for any loss by assignment, subrogation inheritance, or otherwise form the actual victim, unless that person has acquired an actual ownership interest in the forfeited property.

(w) The term violator means the person whose use or acquisition of the property in violation of the law subjected such property to seizure for forfeiture.

## § 9.3 Petitions in administrative forfeiture cases.

(a) Notice of seizure.  The notice of seizure and intent to forfeit the property shall advise any persons who may have a present ownership interest in the property to submit their petitions for remission or mitigation within thirty (30) days of the date they receive the notice in order to facilitate processing. Petitions shall be considered any time after notice until the forfeited property is placed into official use, sold, or otherwise disposed of according to law, except in cases involving petitions to restore the proceeds from the sale of forfeited property.  A notice of seizure shall include the title of the seizing agency, the Ruling Official, the mailing and street address of the official to whom petitions should be sent, and an asset identifier number.

(b) Persons who may file.  A petition for remission or mitigation must be filed by a petitioner as defined in § 9.2(o) or as prescribed in §§ 9.9(g) and (h).

(c) Contents of petition.

(1) All petitions must include the following information in clear and concise terms:

(i) The name, address, and social security or other taxpayer identification number of the person claiming an interest in the seized property who is seeking remission or mitigation;

(ii) The name of the seizing agency, the asset identifier number, and the date and place of seizure;

(iii) A complete description of the property, including make, model, and serial numbers, if any;  and

(iv) A description of the petitioner's interest in the property as owner, lienholder, or otherwise, supported by original or certified bills of sale, contracts, deeds, mortgages, or other documentary

evidence.

(2) Any factual recitation or documentation of any type in a petition must be supported by a sworn affidavit.

(d) Releases.  In addition to the contents of the petition for remission or mitigation set forth in paragraph (c) of this section, upon request, the petitioner shall also furnish the agency with an instrument executed by the titled or registered owner and any other known claimant of an interest in the property releasing interest in such property.

(e) Filing petition with agency.

(1) A petition for remission or mitigation subject to administrative forfeiture shall be addressed to the appropriate federal agency as follows:

(i) Drug Enforcement Administration, Office of Chief Counsel, Street Address:  700 Army Navy Drive, Arlington, VA 22202

Mailing Address:  P.O. Box 28356, Washington, D.C. 20038.

(ii) Federal Bureau of Investigation, Special Agent in Charge, Field Office that seized the property.

(iii) Immigration and Naturalization Service District Director, Chief Patrol Agent, or Regional Asset Forfeiture Office at location with jurisdiction over the forfeiture proceeding.

(2) The petition is to be sent to the official address provided in the notice of seizure and shall be sworn to by the petitioner or by the petitioner's attorney upon information and belief, supported by the client's sworn notice of representation pursuant to 28 U.S.C. 1746, as set out in § 9.9(g).  The Chief of the Asset Forfeiture and Money Laundering Section is delegated authority to amend the address of the official to whom petitions may be sent from time to time, as necessary, by publishing notice of the change of address in the Federal Register.  Failure to publish a notice of change of address in the Federal Register shall not alter the authority of the Ruling Official to determine petitions for remission or mitigation nor the obligation of a petitioner to file a petition at the address provided in the notice of seizure.  Failure to publish a notice of change of address in the Federal Register shall not be grounds for expanding the time for filing a petition for remission or mitigation under the regulations in this part.

(f) Agency investigation.  Upon receipt of a petition, the seizing agency shall investigate the merits of the petition and prepare a written report containing the results of that investigation.  This report shall be submitted to the Ruling Official for review and consideration.

(g) Ruling.  Upon receipt of the petition and the agency report, the Ruling Official for the seizing agency shall review the petition and the report, and shall rule on the merits of the petition.  No hearing shall be held.

(h) Petitions granted.  If the Ruling Official grants a remission or mitigation of the forfeiture, a copy of the decision shall be mailed to the petitioner or, if represented by an attorney, to the petitioner's attorney. A copy shall also be sent to the United States Marshals Service or other property custodian.  The written decision shall include the terms and conditions, if any, upon which the remission or mitigation is granted and the procedures the petitioner must follow to obtain release of the property or the monetary interest therein.

(i) Petitions denied. If the Ruling Official denies a petition, a copy of the decision shall be mailed to the petitioner or, if represented by an attorney, to the petitioner's attorney of record. A copy of the decision shall also be sent to the United States Marshals Service or other property custodian. The decision shall specify the reason that the petition was denied. The decision shall advise the petitioner that a request for reconsideration of the denial of the petition may be submitted to the Ruling Official in accordance with paragraph (j) of this section.

(j) Request for reconsideration.

(1) A request for reconsideration of the denial of the petition shall be considered if:

(i) It is postmarked or received by the office of the Ruling Official within ten (10) days from the receipt of the notice of denial of the petition by the petitioner; and

(ii) The request is based on information or evidence not previously considered that is material to the basis for the denial or presents a basis clearly demonstrating that the denial was erroneous.

(2) In no event shall a request for reconsideration be decided by the same Ruling Official who ruled on the original petition.

(3) Only one request for reconsideration of a denial of a petition shall be considered.

(k) Restoration of proceeds from sale.

(1) A petition for restoration of the proceeds from the sale of forfeited property, or for the appraised value of forfeited property when the forfeited property has been retained by or delivered to a government agency for official use, may be submitted by an owner or lienholder in cases in which the petitioner:

(i) Did not know of the seizure prior to the entry of a declaration of forfeiture; and

(ii) Could not reasonably have known of the seizure prior to the entry of a declaration of forfeiture.

(2) Such a petition shall be submitted pursuant to paragraphs (b) through (e) of this section within ninety (90) days of the date the property is sold or otherwise disposed of.

## § 9.4 Petitions in judicial forfeiture cases.

(a) Notice of seizure. The notice of seizure and intent to forfeit the property shall advise any persons who may have a present ownership interest in the property to submit their petitions for remission or mitigation within thirty (30) days of the date they receive the notice in order to facilitate processing. Petitions shall be considered any time after notice until such time as the forfeited property is placed in official use, sold, or otherwise disposed of according to law, except in cases involving petitions to restore property. A notice of seizure shall include the title of the Ruling Official and the mailing and street address of the official to whom petitions should be sent, the name of the agency seizing the property, an asset identifier number, and the district court docket number.

(b) Persons who may file. A petition for remission or mitigation must be filed by a petitioner as defined in § 9.2(o) or as prescribed in §§ 9.9 (g) and (h).

(c) Contents of petition.

(1) All petitions must include the following information in clear and concise terms:

(i) The name, address, and social security or other taxpayer identification number of the person claiming an interest in the seized property who is seeking remission or mitigation;

(ii) The name of the seizing agency, the asset identifier number, and the date and place of seizure;

(iii) The district court docket number;

(iv) A complete description of the property, including the address or legal description of real property, and make, model, and serial numbers of personal property, if any; and

(v) A description of the petitioner's interest in the property as owner, lienholder, or otherwise, supported by original or certified bills of sale, contracts, mortgages, deeds, or other documentary evidence.

(2) Any factual recitation or documentation of any type in a petition must be supported by a sworn affidavit.

(d) Releases. In addition to the content of the petition for remission or mitigation set forth in paragraph (c) of this section, the petitioner, upon request, also shall furnish the agency with an instrument executed by the titled or registered owner and any other known claimant of an interest in the property releasing the interest in such property.

(e) Filing petition with Department of Justice. A petition for remission or mitigation of a judicial forfeiture shall be addressed to the Attorney General; shall be sworn to by the petitioner or by the petitioner's attorney upon information and belief, supported by the client's sworn notice of representation pursuant to 28 U.S.C. 1746, as set forth in § 9.9(g); and shall be submitted to the United States Attorney for the district in which the judicial forfeiture proceedings are brought. A petitioner also shall submit a copy of the petition to the seizing agency in the judicial district in which the seizure occurred as specified in the notice of seizure, except in Drug Enforcement Administration cases, where the copy shall be submitted to Drug Enforcement Administration Headquarters, Office of Chief Counsel, P.O. Box 28356, Washington, D.C. 20038, or 700 Army Navy Drive, Arlington, VA 22202.

(f) Agency investigation and recommendation; United States Attorney's recommendation. Upon receipt of a petition, the United States Attorney shall direct the seizing agency to investigate the merits of the petition based on the information provided by the petitioner and the totality of the agency's investigation of the underlying basis for forfeiture. The agency shall submit to the United States Attorney a report of its investigation and its recommendation on whether the petition should be granted or denied. Upon receipt of the agency's report and recommendation, the United States Attorney shall forward to the Chief, Asset Forfeiture and Money Laundering Section, the petition, the seizing agency's report and recommendation, and the United States Attorney's recommendation on whether the petition should be granted or denied.

(g) Ruling. The Chief shall rule on the petition. No hearing shall be held. The Chief shall not rule on any petition in any case in which similar petition has been administratively denied by the seizing agency prior to the referral of the case to the United States Attorney for the institution of forfeiture proceedings.

(h) Petitions under Internal Revenue Service liquor laws. The Chief shall accept and consider petitions submitted in judicial forfeiture proceedings under the Internal Revenue Service liquor laws only prior to

the time a decree of forfeiture is entered. Thereafter, district courts have exclusive jurisdiction.

(i) Petitions granted. If the Chief grants a remission or mitigates the forfeiture, the Chief shall mail a copy of the decision to the petitioner or, if represented by an attorney, to the petitioner's attorney, the appropriate United States Attorney, the United States Marshals Service or other property custodian, and the appropriate seizing agency. The written decision shall include the terms and conditions, if any, upon which the remission or mitigation is granted and the procedures the petitioner must follow to obtain release of the property or the monetary interest therein. The Chief shall advise the petitioner or the petitioner's attorney to consult with the United States Attorney as to such terms and conditions. The United States Attorney shall confer with the seizing agency regarding the release and shall coordinate disposition of the property with that office and the United States Marshals Service or other property custodian.

(j) Petitions denied. If the Chief denies a petition, a copy of that decision shall be mailed to the petitioner, or if represented by an attorney, to the petitioner's attorney of record, to the appropriate United States Attorney, the United States Marshals Service or other property custodian, and to the appropriate seizing agency. The decision shall specify the reason that the petition was denied. The decision shall advise the petitioner that a request for reconsideration of the denial of the petition may be submitted to the Chief at the address provided in the decision, in accordance with paragraph (k) of this section.

(k) Request for reconsideration.

(1) A request for reconsideration of the denial shall be considered if:

(i) It is postmarked or received by the Asset Forfeiture and Money Laundering Section at the address contained in the decision denying the petition within ten (10) days from the receipt of the notice of denial of the petition by the petitioner; and

(ii) The request is based on information or evidence not previously considered that is material to the basis for the denial or presents a basis clearly demonstrating that the denial was erroneous. A copy of the request must be received by the appropriate United States Attorney within ten (10) days of the receipt of the denial by the petitioner.

(2) In no event shall a request for reconsideration be decided by the Ruling Official who ruled on the original petition.

(3) Only one request for reconsideration of a denial of a petition shall be considered.

(4) Upon receipt of the request for reconsideration of the denial of a petition, disposition of the property will be delayed pending notice of the decision at the request of the Chief. If the United States Attorney does not receive a copy of the request for reconsideration within the prescribed period, the deposition of the property may proceed.

(l) Restoration of Proceeds from sale.

(1) A petition for restoration of the proceeds from the sale of forfeited property, or for the appraised value of forfeited property when the forfeited property has been retained by or delivered to a government agency for official use, may be submitted by an owner or lienholder in cases in which the petitioner:

(i) Did not know of the seizure prior to the entry of a final order of forfeiture; and

(ii) Could not reasonably have known of the seizure prior to the entry of a final order of forfeiture.

(2) Such a petition must be submitted pursuant to paragraphs (b) through (e) of this section within ninety (90) days of the date the property was sold or otherwise disposed of.

### § 9.5 Criteria governing administrative and judicial remission and mitigation.

(a) Remission.

(1) The Ruling Official shall not grant remission of a forfeiture unless the petitioner establishes that:

(i) The petitioner has a valid, good faith, and legally cognizable interest in the seized property as owner or lienholder as defined in this part; and

(ii) The petitioner is innocent within the meaning of the innocent owner provisions of the applicable civil forfeiture statute, is a bona fide purchaser for value without cause to believe that the property was subject to forfeiture at the time of the purchase, or is one who held a legally cognizable interest in the seized property at the time of the violation underlying the forfeiture superior to that of the defendant within the meaning of the applicable criminal forfeiture statute, and is thereby entitled to recover his or her interest in the forfeited property by statute. (If the applicable civil forfeiture statute contains no innocent owner defense, the innocent owner provisions applicable to 21 U.S.C. 881(a)(4) shall apply.) Unless otherwise provided by statute, in the case of petitioners who acquired their interest in the property after the time of the violation underlying the forfeiture, the question of whether the petitioner had knowledge of the violation shall be determined as of the point in time when the interest in the property was acquired.

(2) The knowledge and responsibilities of petitioner's representative, agent, or employee in paragraph (a)(1)(ii) of this section are imputed to the petitioner where the representative, agent, or employee was acting in the course of his or her employment and in furtherance of the petitioner's business.

(3) The petitioner has the burden of establishing the basis for granting a petition for remission or mitigation of forfeited property, a restoration of proceeds of sale or appraised value of forfeited property, or a reconsideration of a denial of such a petition. Failure to provide information or documents and to submit to interviews, as requested, may result in a denial of the petition.

(4) The Ruling Official shall presume a valid forfeiture and shall not consider whether the evidence is sufficient to support the forfeiture.

(5) Willful, materially-false statements or information, made or furnished by the petitioner in support of a petition for remission or mitigation of forfeited property, the restoration of proceeds or appraised value of forfeited property, or the reconsideration of a denial of any such petition, shall be grounds for denial of such petition and possible prosecution for the filing of false statements.

(b) Mitigation.

(1) The Ruling Official may grant mitigation to a party not involved in the commission of the offense underlying forfeiture:

(i) Where the petitioner has not met the minimum conditions for remission, but the Ruling Official finds that some relief should be granted to avoid extreme hardship, and that return of the property

combined with imposition of monetary and/or other conditions of mitigation in lieu of a complete forfeiture will promote the interest of justice and will not diminish the deterrent effect of the law. Extenuating circumstances justifying such a finding include those circumstances that reduce the responsibility of the petitioner for knowledge of the illegal activity, knowledge of the criminal record of a user of the property, or failure to take reasonable steps to prevent the illegal use or acquisition by another for some reason, such as a reasonable fear of reprisal; or

(ii) Where the minimum standards for remission have been satisfied but the overall circumstances are such that, in the opinion of the Ruling Official, complete relief is not warranted.

(2) The Ruling Officials may in his or her discretion grant mitigation to a party involved in the commission of the offense underlying the forfeiture where certain mitigating factors exist, including, but not limited to: the lack of a prior record or evidence of similar criminal conduct; if the violation does not include drug distribution, manufacturing, or importation, the fact that the violator has taken steps, such as drug treatment, to prevent further criminal conduct; the fact that the violation was minimal and was not part of a larger criminal scheme; the fact that the violator has cooperated with federal, state, or local investigations relating to the criminal conduct underlying the forfeiture; or the fact that complete forfeiture of an asset is not necessary to achieve the legitimate purposes of forfeiture.

(3) Mitigation may take the form of a monetary condition or the imposition of other conditions relating to the continued use of the property, and the return of the property, in addition to the imposition of any other costs that would be chargeable as a condition to remission. This monetary condition is considered as an item of cost payable by the petitioner, and shall be deposited into the Assets Forfeiture Fund as an amount realized from forfeiture in accordance with the applicable statute. If the petitioner fails to accept the Ruling Official's mitigation decision or any of its conditions, or fails to pay the monetary amount within twenty (20) days of the receipt of the decision, the property shall be sold, and the monetary amount imposed and other costs chargeable as a condition to mitigation shall be subtracted from the proceeds of the sale before transmitting the remainder to the petitioner.

### § 9.6 Special rules for specific petitioners.

(a) General creditors. A general creditor may not be granted remission or mitigation of forfeiture unless he or she otherwise qualifies as petitioner under this part.

(b) Rival claimants. If the beneficial owner of the forfeited property and the owner of a security interest in the same property each files a petition, and if both petitions are found to be meritorious, the claims of the beneficial owner shall take precedence.

(c) Voluntary bailments. A petitioner who allows another to use his or her property without cost, and who is not in the business of lending money secured by property or of leasing or renting property for profit, shall be granted remission or mitigation of forfeiture in accordance with the provisions of § 9.5.

(d) Lessors. A person engaged in the business of leasing or renting real or personal property on a long-term basis with the right to sublease shall not be entitled to remission or mitigation of a forfeiture of such property unless the lessor can demonstrate compliance with all the requirements of § 9.5.

(e) Straw owners. A petition by any person who has acquired a property interest recognizable under this part, and who knew or had reason to believe that the interest was conveyed by the previous owner for the purpose of circumventing seizure, forfeiture, or the regulations in this part, shall be denied. A petition by a person who purchases or owns property for another who has a record for related crimes as defined in §

9.2(r), or a petition by a lienholder who knows or has reason to believe that the purchaser or owner of record is not the real purchaser or owner, shall be denied unless both the purchaser of record and the real purchaser or owner meet the requirements of § 9.5.

(f) Judgment creditors.

(1) A judgment creditor will be recognized as a lienholder if:

(i) The judgment was duly recorded before the seizure of the property for forfeiture;

(ii) Under applicable state or other local law, the judgment constitutes a valid lien on the property that attached to it before the seizure of the property for forfeiture; and

(iii) The petitioner had no knowledge of the commission of any act or acts giving rise to the forfeiture at the time the judgment became a lien on the forfeited property.

(2) A judgment creditor will not be recognized as a lienholder if the property in question is not property of which the judgment debtor is entitled to claim ownership under applicable state or other local law (e.g., stolen property). A judgment creditor is entitled under this part to no more than the amount of the judgment, exclusive of any interest, costs, or other fees including attorney's fees associated with the action that led to the judgment or its collection.

(3) A judgment creditor's lien must be registered in the district where the property is located if the judgment was obtained outside the district.

### § 9.7 Terms and conditions of remission and mitigation.

(a) Owners.

(1) An owner's interest in property that has been forfeited is represented by the property itself or by a monetary interest equivalent to that interest at the time of seizure. Whether the property or a monetary equivalent will be remitted to an owner shall be determined at the discretion of the Ruling Official.

(2) If a civil judicial forfeiture action against the property is pending, release of the property must await an appropriate court order.

(3) Where the government sells or disposes of the property prior to the grant of the remission, the owner shall receive the proceeds of that sale, less any costs incurred by the government in the sale. The Ruling Official, at his or her discretion, may waive the deduction of costs and expenses incident to the forfeiture.

(4) Where the owner does not comply with the conditions imposed upon release of the property by the Ruling Official, the property shall be sold. Following the sale, the proceeds shall be used to pay all costs of the forfeiture and disposition of the property, in addition to any monetary conditions imposed. The remaining balance shall be paid to the owner.

(b) Lienholders.

(1) When the forfeited property is to be retained for official use or transferred to a state or local law enforcement agency or foreign government pursuant to law, and remission or mitigation has been granted to a lienholder, the recipient of the property shall assure that:

(i) In the case of remission, the lien is satisfied as determined through the petition process; or

(ii) In the case of mitigation, an amount equal to the net equity, less any monetary conditions imposed, is paid to the lienholder prior to the release of the property to the recipient agency of foreign government.

(2) When the forfeited property is not retained for official use or transferred to another agency or foreign government pursuant to law, the lienholder shall be notified by the Ruling Official of the right to select either of the following alternatives:

(i) Return of property. The lienholder may obtain possession of the property after paying the United States, through the Ruling Official, the costs and expenses incident to the forfeiture, the amount, if any, by which the appraised value of the property exceeds the lienholder's net equity in the property, and any amount specified in the Ruling Official's decision as a condition to remit the property. The Ruling Official, at his or her discretion, may waive costs and expenses incident to the forfeiture. The Ruling Official shall forward a copy of the decision, a memorandum of disposition, and the original releases to the United States Marshals Service or other property custodian who shall thereafter release the property to the lienholder; or

(ii) Sale of Property and Payment to Lienholder. Subject to the provisions of § 9.9(a), upon sale of the property, the lienholder may receive the payment of a monetary amount up to the sum of the lienholder's net equity, less the expenses and costs incident to the forfeiture and sale of the property, and any other monetary conditions imposed. The Ruling Official, at his or her discretion, may waive costs and expenses incident to the forfeiture.

(3) If the lienholder does not notify the Ruling Official of the selection of one of the two options set forth in paragraph (b)(2) of this section within twenty (20) days of the receipt of notification, the Ruling Official shall direct the United States Marshal or other property custodian to sell the property and pay the lienholder an amount up to the net equity, less the costs and expenses incurred incident to the forfeiture and sale, and any monetary conditions imposed. In the event a lienholder subsequently receives a payment of any kind on the debt owed for which he or she received payment as a result of the granting of remission or mitigation, the lienholder shall reimburse the Assets Forfeiture Fund to the extent of the payment received.

(4) Where the lienholder does not comply with the conditions imposed upon the release of the property, the property shall be sold after forfeiture. From the proceeds of the sale, all costs incident to the forfeiture and sale shall first be deducted, and the balance up to the net equity, less any monetary conditions, shall be paid to the lienholder.

## § 9.8 Provisions applicable to victims.

The provisions of this section apply to victims of an offense underlying the forfeiture of property, or of a related offense, who do not have a present ownership interest in the forfeited property (or, in the case of multiple victims of an offense, who do not have a present ownership interest in the forfeited property that is clearly superior to that of other petitioner victims). The provisions of this section apply only with respect to property forfeited pursuant to statutes that explicitly authorize restoration or remission of forfeited property to victims. Victims who have a superior present legally cognizable ownership interest in forfeited property may file petitions, as other owners, subject to the regulations set forth in § 9.7(a). The claims of such owner victims, like those of any other owners, shall have priority over the claims of any non-owner victims whose claims are recognized pursuant to this section.

(a) Qualification to file. A victim, as defined in § 9.2(v), of an offense that was the underlying basis for the criminal, civil, or administrative forfeiture of specific property, or a victim of a related offense, may be granted remission of the forfeiture of that property, if in addition to complying with the other applicable provisions of § 9.8, the victim satisfactorily demonstrates that:

(1) A pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture, and that the loss is supported by documentary evidence including invoices and receipts;

(2) The pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of a criminal offense;

(3) The victim did not knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis of the forfeiture;

(4) The victim has not in fact been compensated for the wrongful loss of the property by the perpetrator or others; and

(5) The victim does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the property.

(b) Pecuniary loss. The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss. No allowance shall be made for interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense.

(c) Torts. A tort associated with illegal activity that formed the basis for the forfeiture shall not be a basis for remission, unless it constitutes the illegal activity itself, nor shall remission be granted for physical injuries to a petitioner or for damage to a petitioner's property.

(d) Denial of petition. In the exercise of his or her discretion, the Ruling Official may decline to grant remission where:

(1) There is substantial difficulty in calculating the pecuniary loss incurred by the victim or victims;

(2) The amount of the remission, if granted, would be small compared with the amount of expenses incurred by the government in determining whether to grant remission; or

(3) The total number of victims is large and the monetary amount of the remission so small as to make its granting impractical.

(e) Pro rata basis. In granting remission to multiple victims pursuant to this section, the Ruling Official should generally grant remission on a pro rata basis to recognized victims when petitions cannot be granted in full due to the limited value of the forfeited property. However, the Ruling Official may consider, among others, the following factors in establishing appropriate priorities in individual cases:

(1) The specificity and reliability of the evidence establishing a loss;

(2) The fact that a particular victim is suffering an extreme financial hardship;

(3) The fact that a particular victim has cooperated with the government in the investigation related to the forfeiture or to a related persecution or civil action; and

(4) In the case of petitions filed by multiple victims of related offenses, the fact that a particular victim is a victim of the offense underlying the forfeiture.

(f) Reimbursement.  Any petitioner granted remission pursuant to this part shall reimburse the Assets Forfeiture Fund for the amount received to the extent the individual later receives compensation for the loss of the property from any other source.  The petitioner shall surrender the reimbursement upon payment from any secondary source.

(g) Claims of financial institution regulatory agencies.  In cases involving property forfeitable under 18 U.S.C. 981(a)(1)(C) or (a)(1)(D), the Ruling Official may decline to grant a petition filed by a petitioner in whole or in part due to the lack of sufficient forfeitable funds to satisfy both the petition and claims of the financial institution regulatory agencies pursuant to 18 U.S.C. 981(e)(3) or (7).  Generally, claims of financial institution regulatory agencies pursuant to 18 U.S.C. 981(e)(3) or (7) shall take priority over claims of victims.

### § 9.9 Miscellaneous Provisions.

(a) Priority of payment.  Except where otherwise provided in this part, costs incurred by the United States Marshals Service and other agencies participating in the forfeiture that were incident to the forfeiture, sale, or other disposition of the property shall be deducted from the amount available for remission or mitigation.  Such costs include, but are not limited to, court costs, storage costs, brokerage and other sales-related costs, the amount of any liens and associated costs paid by the government on the property, costs incurred in paying the ordinary and necessary expenses of a business seized for forfeiture, awards for information as authorized by statute, expenses of trustees or other assistants pursuant to paragraph (c) of this section, investigative or prosecutive costs specially incurred incident to the particular forfeiture, and costs incurred incident to the processing of the petition(s) for remission or mitigation.  The remaining balance shall be available for remission or mitigation.  The Ruling Official shall direct the distribution of the remaining balance in the following order or priority, except that the Ruling Official may exercise discretion in determining the priority between petitioners belonging to classes described in paragraphs (a)(3) and (4) of this section in exceptional circumstances:

(1) Owners;

(2) Lienholders;

(3) Federal financial institution regulatory agencies (pursuant to paragraph (e) of this section), not constituting owners or lienholders; and

(4) Victims not constituting owners or lienholders (pursuant to § 9.8).

(b) Sale or disposition of property prior to ruling.  If forfeited property has been sold or otherwise disposed of prior to a ruling, the Ruling Official may grant relief in the form of a monetary amount.  The amount realized by the sale of the property is presumed to be the value of the property.  Monetary relief shall not be greater than the appraised value of the property at the time of seizure and shall not exceed the amount realized from the sale or other disposition.  The proceeds of the sale shall be distributed as follows:

(1) Payment of the government's expenses incurred incident to the forfeiture and sale, including court costs and storage charges, if any;

(2) Payment to the petitioner of an amount up to his or her interest in the property;

(3) Payment to the Assets Forfeiture Fund of all other costs and expenses incident to the forfeiture;

(4) In the case of victims, payment of any amount up to the amount of his or her loss;  and

(5) Payment of the balance remaining, if any, to the Assets Forfeiture Fund.

(c) Trustees and other assistants.  In the exercise of his or her discretion, the Ruling Official, with the approval of the Asset Forfeiture and Money Laundering Section, may use the services of a trustee, other government official, or appointed contractors to notify potential petitioners, process petitions, and make recommendations to the Ruling Official on the distribution of property to petitioners. The expense for such assistance shall be paid out of the forfeited funds.

(d) Other agencies of the United States.  Where another agency of the United States is entitled to remission or mitigation of forfeited assets because of an interest that is recognizable under this part or is eligible for such transfer pursuant to 18 U.S.C. 981(e)(6), such agency shall request the transfer in writing, in addition to complying with any applicable provisions of §§ 9.3 through 9.5.  The decision to make such transfer shall be made in writing by the Ruling Official.

(e) Financial institution regulatory agencies.  A Ruling Official may direct the transfer of property under 18 U.S.C. 981(e) to certain federal financial institution regulatory agencies or an entity acting in their behalf, upon receipt of a written request, in lieu of ruling on a petition for remission or mitigation.

(f) Transfers to foreign governments.  A Ruling Official may decline to grant remission to any petitioner other than an owner or lienholder so that forfeited assets may be transferred to a foreign government pursuant to 18 U.S.C. 981(i)(1), 19 U.S.C. 1616a(c)(2), or 21 U.S.C. 881(e)(1)(E).

(g) Filing by attorneys.

(1) A petition for remission or mitigation may be filed by a petitioner or by his or her attorney or legal guardian.  If an attorney files on behalf of the petitioner, the petition must include a signed and sworn statement by the client-petitioner stating that:

(i) The attorney has the authority to represent the petitioner in this proceeding;

(ii) The petitioner has fully reviewed the petition;  and

(iii) The petition is truthful and accurate in every respect.

(2) Verbal notification of representation is not acceptable.  Responses and notification of rulings shall not be sent to an attorney claiming to represent a petitioner unless a written notice of representation is filed.  No extensions of time shall be granted due to delays in submission of the notice of representation.

(h) Consolidated petitions.  At the discretion of the Ruling Official in individual cases, a petition may be filed by one petitioner on behalf of other petitioners, provided the petitions are based on similar underlying facts, and the petitioner who files the petition has written authority to do so on behalf of the

other petitioners. This authority must be either expressed in documents giving the petitioner the authority to file petitions for remission, or reasonably implied from documents giving the petitioner express authority to file claims or lawsuits related to the course of conduct in question on behalf of these petitioners. An insurer or an administrator of an employee benefit plan, for example, which itself has standing to file a petition as a "victim" within the meaning of § 9.2(v), may also file a petition on behalf of its insured or plan beneficiaries for any claims they may have based on co-payments made to the perpetrator of the offense underlying the forfeiture or the perpetrator of a "related offense" within the meaning of § 9.2(s), if the authority to file claims or lawsuits is contained in the document or documents establishing the plan. Where such a petition is filed, any amounts granted as a remission must be transferred to the other petitioners, not the party filing the petition; although, in his or her discretion, the Ruling Official may use the actual petitioner as an intermediary for transferring the amounts authorized as a remission to the other petitioners.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　**Plaintiff,**　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　**v.**　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | **Civil Action No. 25-cv- 1769** |
| **VIRTUAL CURRENCY ASSOCIATED**　) | |
| **WITH NORTH KOREAN IT WORKER**　) | |
| **MONEY LAUNDERING AND**　　　　) | |
| **SANCTIONS EVASION CONSPIRACIES,**　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　**Defendant.**　　　) | |
| 　　　　　　　　　　　　　　　　　) | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against "Defendant Property," as defined and described below, and alleges as follows:

**NATURE OF THE ACTION**

1. As described below, this is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) against virtual currency, nonfungible tokens (NFTs), and Ethereum Name Service (ENS) domains, all of which were involved in a conspiracy (or multiple conspiracies) to violate 18 U.S.C. § 1956(a)(2)(A) and 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i), all in violation of 18 U.S.C. § 1956(h), and which constituted the proceeds of wire fraud in violation of 18 U.S.C. § 1343, and of violations of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et. seq.*[1]

---

[1]　　All dates, times, and amounts referenced in this document are approximate.

**THE DEFENDANTS *IN REM***

2.    The defendants *in rem* are as follows:

a.    Virtual currency seized from unhosted[2] virtual currency addresses and two accounts at Binance (a virtual currency exchange or "VCE") during the execution of seizure warrant 22-sz-6 (collectively referred to herein as the "March 2022 Seized Property"):

| Unhosted Address Assets | Amount |
|---|---|
| BTC | 0.0088168900 |
| LTC | 0.1277800100 |
| ETH | 521.8746883372 |
| STARL | 29692425251.2506000000 |
| ENS | 9356.0348458065 |
| USDT | 57108.4877230000 |
| DBUY | 3496980.1704557400 |
| KUMA | 138831744207.6800000000 |
| USDC | 11408.4319970000 |
| CRV | 2701.7377850068 |
| DAI | 3547.2432407695 |
| SMI | 239599819.0021540000 |
| PERP | 4.6601186800 |
| GTC | 0.0000449293 |
| BNB | 1.6022037064 |
| BUSD | 6750.0000000000 |
| ABGRT | 0.5760000000 |
| MATIC | 9.9860082833 |
| FTM | 16.8386154779 |
| AVAX | 2.8160756402 |

| Binance          Account 81090004: | |
|---|---|
| BNB | 0.0000124000 |
| BTC | 0.0000073300 |
| ETH | 145.7000897500 |

---

[2]    As explained below, an unhosted wallet, also known as a self-hosted or non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. All of the unhosted wallet addresses from which law enforcement seized funds tied to this investigation are listed, in full, in Attachment A.

| | |
|---|---|
| USDT | 1484636.8067804600 |
| SAND | 14082.9700000000 |
| USDC | 0.7433070000 |
| BUSD | 0.4068787400 |

**Binance Account 118543589:**

| | |
|---|---|
| BNB | 0.0000521300 |
| ETH | 0.0000350000 |
| USDT | 2411417.7593996300 |

b. Virtual currency seized from unhosted virtual currency addresses, NFTs, and ENS domain names during the execution of seizure warrant 22-sz-13 (collectively referred to herein as the "June 2022 Seized Property"):

| Unhosted Address Assets | Amount |
|---|---|
| Punk Vault (NFTX) | 0.135126 |
| USD Coin (USDC) | 1,668.782899 |
| SafeMoon Inu (SMI) | 264,222,552.086639 |
| UniCrypt (UNCX) | 3.000000 |
| Ethereum (ETH) | 0.192765 |
| Tether (USDT) | 77.122725 |
| Project Inverse (XIV) | 3,000.000000 |

**NFTs:**
"Tender Morphism" 7/7
Gurlz Go Wildd #43
"Sweet Symphony" 10/10
Invisible Scissors #15
Invisible Scissors #86
Invisible Scissors #35

**ENS Domain Names:**
vhurryharry.eth
halfmooneye.eth

3

c. Virtual currency seized from two accounts at Binance during the execution of seizure warrant 22-sz-18 (collectively referred to herein as the "August 2022 Seized Property"):

**Binance Account 369902286:**

| Asset | Amount |
|-------|--------|
| BTC | 1.047995 |
| USDT | 200 |

**Binance Account 126474093:**

| Asset | Amount |
|-------|--------|
| USDT | 135 |

d. Virtual currency seized from unhosted virtual currency addresses 0x815F335f976301f496167bfeF237f0622F92ac38 and 0x81c4d8816b29147c542dDE87485608204690Acf2 during the execution of seizure warrant 22-sz-19 (collectively referred to herein as the "September 2022 Seized Property"):

| Asset | Amount |
|-------|--------|
| USDC on Ethereum | 187,035.41 |
| USDC on Avalanche | 31,584.20 |
| USDC on Ethereum | 12,262.25 |

e. Virtual currency in the form of USDT (a stablecoin pegged to the U.S. dollar) that was voluntarily frozen by Tether Limited ("Tether," the company that mints/creates USDT tokens) on or about September 1, 2022, in unhosted virtual currency addresses 0x815F335f976301f496167bfeF237f0622F92ac38 and 0x81c4d8816b29147c542dDE87485608204690Acf2 (i.e., the same addresses referenced above in paragraph 2(d), as virtual currency addresses can store more than one type of virtual currency at a time):

| **Asset** | **Amount** |
|---|---|
| USDT on Ethereum | 145,491.97 |
| USDT on Ethereum | 387,550.90 |

f. USDT that was voluntarily frozen by Tether on or about March 6, 2023, in unhosted virtual currency address 0x4F47Bc496083C727c5fbe3CE9CDf2B0f6496270c.

g. USDT that was voluntarily frozen by Tether on or about March 6, 2023, in unhosted virtual currency addresses 0x5707aA6944E357cEa1A25Ff991fB3A2E60268AB5 and 0xB389B4B4a8a6E267CA0712321cdca5c856ef8A72.

h. USDT that was voluntarily frozen by Tether on or about April 1, 2023, in unhosted virtual currency addresses 0x15824de78A61a8B493CCd8A48e58463536B17028, 0x6E2F0deAB1C358547b353342524489e32640D530, 0x3E24F610639e105173003EF1c47dC4DbAa33f8D7, and 0x1c097e02bCd6cD69946663ace4bc0B115e256bAc.

3. All of the items above are also listed in Attachment A and are collectively referred to herein as the "Defendant Property."

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* to forfeit and condemn the Defendant Property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, over an action for forfeiture under 28 U.S.C. § 1355(a), and over this particular action under 18 U.S.C. § 981(a)(1)(A) and (C).

5. This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b). Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the Defendant Property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(C).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because one or more of the acts or omissions in furtherance of the conspiracy or conspiracies giving rise to the forfeiture occurred in this district. That is, in sending, attempting to send, and conspiring to send funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, as a means of evading sanctions placed on North Korea, and without obtaining a license to do so from the Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, the persons who sent, attempted to send, and conspired to send said funds committed an act or omission in this district. Venue is this district is also appropriate under 28 U.S.C. § 1355(b)(1)(B) and 18 U.S.C. § 3238 because the conspiracy or conspiracies giving rise to the forfeiture began and was committed outside the United States, and no prospective defendant is known to have resided in the United States. Venue in this district is also appropriate under 28 U.S.C. § 1395(a) as the accrues in this district, (b) as the property may be found in this district, and (c) as the government seized the property outside any judicial district and brought it to this district.

## BASIS FOR FORFEITURE

7. The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in violations of, and a conspiracy, or multiple conspiracies, to violate several provisions of the money laundering statute, including violations of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), and (h). Specifically:

a.  to the extent that the Defendant Property was derived from a wire fraud offense committed in violation of 18 U.S.C. § 1343 and/or from a violation of IEEPA, 50 U.S.C. § 1705, and was involved in a financial transaction conducted with the intent to commit a violation, or an additional violation, of IEEPA, the Defendant Property was involved in a violation of 18 U.S.C. § 1956(a)(1)(A)(i) and/or a conspiracy to violate that statute;

b.  to the extent that the Defendant Property was derived from a wire fraud offense committed in violation of 18 U.S.C. § 1343 and/or from a violation of the IEEPA, 50 U.S.C. § 1705, and was involved in a financial transaction conducted for the purpose of concealing and disguising the source, nature, location, ownership and control of such property, the property was involved in a violation of 18 U.S.C. § 1956(a)(1)(B)(i), and/or a conspiracy to violate that statute; and

c.  to the extent that the Defendant Property was involved in a conspiracy to send property from the United States or through the United States to a foreign country with the intent to commit a violation of IEEPA, the Defendant Property was involved in a conspiracy to violate the international promotional money laundering statute, 18 U.S.C. § 1956(a)(2)(A).

8.  The Defendant Property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it is the proceeds of a violation of the wire fraud statute, 18 U.S.C. § 1343, and of IEEPA, 50 U.S.C. § 1705.

## BACKGROUND REGARDING IEEPA

9.  The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et seq.*, granted the President the authority to deal with unusual and extraordinary foreign

threats to the national security, foreign policy, or economy of the United States. Under IEEPA, the President can declare a national emergency and issue Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to impose economic sanctions on a foreign country. It is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA. 50 U.S.C. § 1705(a).

10. Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating weapons of mass destruction (WMD). On November 14, 1994, the President issued Executive Order (EO) 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

11. On June 28, 2005, the President, to take additional steps with respect to the national emergency described and declared in EO 12938, issued EO 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13382 authorized the U.S. Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101, *et seq.* EO 13382 and the Weapons of Mass

Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities designated under these authorities, and they further prohibit any transactions that evade or avoid, or have the purpose of evading or avoiding, any prohibitions set forth in the regulations.

**BACKGROUND REGARDING THE NORTH KOREA SANCTIONS PROGRAM**

12.    Beginning with Executive Order No. 13466, issued pursuant to IEEPA on June 26, 2008, the President found that the situation "on the Korean Peninsula constitute[s] an unusual and extraordinary threat to the national security and foreign policy of the United States and . . . declare[d] a national emergency to deal with that threat."

13.    On March 15, 2016, to take additional steps with respect to the national emergency described in EO 13466 and to address North Korea's continuing pursuit of its nuclear and missile programs, the President issued Executive Order No. 13722, which prohibits both "the exportation or reexportation, direct or indirect, from the United States, or by a United States person, wherever located, of any goods, services, or technology to North Korea" and "any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this section if performed by a United States person or within the United States." EO 13722 further prohibits any transactions that evade or avoid, or have the purpose of evading or avoiding, any prohibitions set forth in those regulations.

14.    To implement these Executive Orders and others concerning North Korea, OFAC issued the "North Korea Sanctions Regulations." *See* 31 C.F.R. § 510.101, *et seq*. OFAC amended and reissued the regulations in their entirety on March 5, 2018.

15. According to the U.S. Department of the Treasury, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with anti-money laundering and countering the financing of terrorism requirements set forth in the Bank Secrecy Act (BSA), as well as sanctions and blocking programs administered by OFAC. The Treasury Department's Financial Crimes Enforcement Network (FinCEN) is responsible for administering the BSA in furtherance of its mission to safeguard the U.S. financial system.

16. Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A, as part of the BSA, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns.

17. A Section 311 finding and the related special measure are implemented through various orders and regulations incorporated into 31 C.F.R. Chapter X. A violation of 31 U.S.C. § 5318A is punishable criminally pursuant to 31 U.S.C. § 5322.

18. In order to protect the integrity of the U.S. financial system, a Section 311 finding can legally prevent U.S. financial institutions from engaging in any type of financial transaction with an entity within the jurisdiction deemed an area of money-laundering concern.

19. In May 2016, FinCEN made a Section 311 finding against North Korea. Specifically, FinCEN's finding deemed the entire North Korean economy as a primary jurisdiction of money-laundering concern. *See* Federal Register, Vol. 81, No. 107 (June 3, 2016). To make such a finding, FinCEN was able to draw upon administrative subpoenas, prior law enforcement investigations, and voluminous BSA data.

20. In November 2016, FinCEN implemented the most severe special measure against the entire North Korean economy. *See* Federal Register, Vol. 81, No. 217 (November 9, 2016).

10

The special measure bars domestic and foreign financial institutions from maintaining U.S. correspondent accounts for any North Korean financial institution or party acting on its behalf. Because of the finding that the entire North Korean financial sector was a primary money laundering concern, FinCEN cut all North Korean entities off from any trade in U.S. dollar transactions via correspondent banking. One expert described the effect of such action was to cut the target off from trade in dollars, thereby isolating it from worldwide business.

21.     FinCEN targeted the entire North Korean economy because it is comprised entirely of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of weapons of mass destruction [] and the development of ballistic missiles in violation of international and U.S. sanctions," and because North Korean financial institutions are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism [] controls." *See* Federal Register, Vol. 81, No. 217 at 78715.

22.     As detailed further below, FinCEN's Section 311 action included a finding that North Korean financial institutions continued to access the U.S. financial system, in violation of the U.S. sanctions. The finding further stated that millions of U.S. dollars' worth of illicit transactions flowed through U.S. correspondent accounts in spite of the sanctions because of the coordinated use of money laundering techniques to conceal North Korea's involvement and the processing of the payments by North Korean financial institutions. Federal Register, Vol. 81, No. 107 at 35442.

**BACKGROUND REGARDING NORTH KOREA'S FOREIGN TRADE BANK**

23.     On March 11, 2013, the Department of the Treasury designated North Korea's Foreign Trade Bank (FTB), North Korea's primary foreign exchange bank, pursuant to EO 13382,

11

for providing financial services that assisted in the proliferating of WMD. In the designation, the Treasury Department stated, "North Korea uses FTB to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . . By designating FTB, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system. FTB is a state-owned bank established in 1959. FTB acts as North Korea's primary foreign exchange bank and has provided key financial support to [another designated entity, Korea Kwangson Banking Corp.]." As a result of the designation, FTB was added to Treasury's Specially Designated National ("SDN") List, which is published on its website.

**<u>BACKGROUND REGARDING NORTH KOREAN IT WORKERS</u>**

24.     According to the August 28, 2020 and March 4, 2021 reports by the United Nations Security Council Panel of Experts, one of the ways North Korea generates illicit revenue is by exploiting online platforms that provide opportunities for freelance and contract work, usually in the information technology ("IT") industry. In other words, North Koreans apply for jobs in remote IT development work, including in the virtual currency industry, without disclosing that they are North Korean. These IT workers bypass security and due diligence checks to acquire accounts on these platforms. Specifically, they (1) use obfuscation strategies to create and maintain accounts, such as virtual private networks, to hide their true location from online payment facilitators and hiring platforms, and (2) use fraudulent, or fraudulently obtained, identity documents to obfuscate their true identity and circumvent know your customer (or "KYC") controls.

25.     According to a separate report published by a Washington, D.C.-based nonprofit, which conducts analysis of global conflict and transnational security issues, 80% of North Korea's overseas labor force is reportedly stationed in China and Russia. Other countries reportedly hosting

North Korean overseas laborers include, among others, the United Arab Emirates (UAE) and Angola.

26.     These IT workers commonly utilize various payment processing services and financial services platforms, including virtual currency exchanges (or VCEs). Many of these services platforms used by IT workers are headquartered in the U.S. Because North Korea is heavily sanctioned and excluded from the U.S. financial system, IT workers circumvent KYC controls that are put in place to ensure said services and platforms do not violate U.S. sanctions imposed on North Korea. North Koreans have been observed utilizing front companies, fraudulent identity documents, stolen identity documents, and identity documents that may have been purchased for North Korea's use to gain access to otherwise prohibited financial services.

27.     The FBI, along with the Department of State and Department of the Treasury, issued a May 2022 advisory[3] to alert the international community, private sector, and general public about the North Korean IT worker threat. The United States and the Republic of Korea (South Korea) co-issued updated guidance in October 2023.[4] Then, the FBI supplemented that guidance with additional information in May 2024.[5] The updated guidance includes indicators to watch for that are consistent with North Korean IT worker fraud schemes.

**BACKGROUND REGARDING VIRTUAL CURRENCY**

28.     **Bitcoin:** Bitcoin (or "BTC") is a type of virtual currency. Unlike traditional, government-controlled currencies (i.e., fiat currencies), such as the U.S. dollar, Bitcoin is not managed or distributed by a centralized bank or entity. Because of that, Bitcoin can be traded without the need for intermediaries. Bitcoin transactions are approved/verified by computers

---

[3]     https://ofac.treasury.gov/media/923126/download?inline
[4]     https://www.ic3.gov/PSA/2023/PSA231018
[5]     https://www.ic3.gov/PSA/2024/PSA240516

running Bitcoin's software. Those computers are called network nodes. Each node uses cryptography to record every Bitcoin transaction on the Bitcoin blockchain. The Bitcoin blockchain is a public, distributed ledger. Bitcoin can be exchanged for fiat currency, other virtual currencies, products, and services.

29. **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

30. **Blockchain Analysis**: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open-source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to

be reliable. In this case, law enforcement used blockchain tracing to uncover the connections between the Defendant Property and this North Korean IT worker conspiracy.

31. **Blockchain Explorer**: A blockchain explorer, also called a block explorer, is software that operates as a blockchain search engine for users to search and review transactional data for any addresses on a particular blockchain. A blockchain explorer uses an application programming interface and blockchain nodes to draw data from a blockchain and uses a database to arrange, visualize, and present the data to a user in a searchable format. This data can include average transaction fees, hash rates, and block size.

32. **Decentralized Finance**: Decentralized Finance, or DeFi, is an umbrella term for peer-to-peer financial services on public blockchains, primarily the Ethereum network, that do not require traditional centralized financial intermediaries. DeFi platforms can offer a range of financial services involving digital assets, including the ability for users to lend, invest, earn interest, and exchange digital assets. DeFi platforms provide these services by using self-executing agreements written in code, known as "smart contracts," and these smart contracts are made accessible to users through decentralized applications (or "DApps").

33. **Key Pair**: A key pair, in cryptography, refers to a private key and its corresponding public key. A key pair is used with a public-key algorithm.

34. **Peel Chains**: A peel chain is a technique used to launder a large amount of virtual currency through a lengthy series of minor transactions. It occurs when virtual currency sitting at one address is sent through a series of transactions in which a slightly smaller amount of virtual currency is transferred to a new address each time. In each transaction, some quantity of virtual currency "peels off" the chain to another address (frequently, to be deposited into a VCE), and the remaining balance is transferred to the next address in the peel chain.

35. **Private Key**: A private key is a cryptographic key that is uniquely associated with an entity and not made public. In the blockchain and virtual currency context, virtual currency addresses are controlled using a unique corresponding private key, the equivalent of a password, which is needed to access the funds associated with the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

36. **Public Key**: A public key is a cryptographic key that is uniquely associated with a person or entity and is designed to be made public. The public key is paired with, and derived from, a private (secret) key. However, knowing the public key does not reveal any information about the private key. In the blockchain and virtual currency context, a virtual currency address is the hashed value of a public key and acts as an identifier on a blockchain.

37. **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC and USDT are stablecoins pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

38. **Tether:** Tether is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

39. **Circle:** Circle Internet Financial, LLC ("Circle") is a U.S.-based VCE that manages the smart contracts and the treasury for USDC tokens.

40. **Transaction Fee**: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the

16

transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in ETH, or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

41.     **Transaction Hash**: A transaction hash, also called a transaction ID, is a unique string of characters which identifies a specific transaction on the blockchain—akin to a serial number or accounting journal entry number. A transaction hash is assigned to a transaction when it is added to the blockchain, and it is generated by applying a hash function to the transaction details, including the sender's address, the receiver's address, and the amount of virtual currency being sent. Transaction hashes can be found on blockchain explorers and can be used to verify and track transactions.

42.     **Virtual Currency**: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central

administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

43.     **Virtual Currency Address**: A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

44.     **Virtual Currency Exchange**: A virtual currency exchange (VCE), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

45.     **Virtual Currency Wallet**: A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

46.     **Hosted Wallet**: A hosted wallet, also known as a custodial wallet, is a virtual currency wallet through which a third party, e.g., a VCE, holds a user's private keys. The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

18

47.     **Unhosted Wallet**: An unhosted wallet, also known as a self-hosted or non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a VCE) to facilitate a transaction involving the wallet. An "unhosted virtual currency address" is a virtual currency address associated with an unhosted wallet.

## FACTS

### A.  Overview of the Investigation

48.     The FBI has been investigating, and continues to investigate, North Korea's use of illegally obtained virtual currency as a means of producing income for North Korea. This illegally obtained virtual currency is generated, in part, through remote work done by North Korean IT workers deployed around the globe. As detailed below, law enforcement has, among other things, examined voluminous evidence and conducted blockchain trancing in order to identify multiple North Korean IT workers involved in a money laundering conspiracy to support the North Korean government. Those IT workers have generated revenue for North Korea via their jobs at blockchain development (or other virtual currency-centric) companies. To effectuate the scheme, these North Korean IT workers used fraudulent (or fraudulently obtained) identification documents to obtain work and to access financial services through unwitting employers. These unwitting employers often pay the North Korean IT workers in stablecoins, such as USDC and USDT. When those unwitting employers are companies based in the U.S., those companies have unwittingly hired the North Korean IT workers—and paid them their salaries—in violation of U.S. sanctions.

49.     In order to send their illegally obtained virtual currency back to North Korea, North Korean IT workers (and/or their money laundering co-conspirators) transfer the virtual currency through a series of transactions designed to hide the source from which the funds came. For

example, North Korean IT workers (and/or their money laundering co-conspirators) have used the following money laundering techniques: (1) setting up accounts with fictitious identities; (2) moving funds in a series of small amounts; (3) moving funds to other blockchains or converting funds to other forms of virtual currency (i.e., "chain hopping" and "token swapping," respectively); (4) purchasing NFTs as a store of value and means of hiding illicit funds; (5) using U.S.-based online accounts to legitimize activity; and (6) commingling their fraud proceeds to hide the origin of the funds.

50.     After laundering these funds, the North Korean IT workers send them back to the North Korean government, at times via Sim Hyon Sop ("SIM") and Kim Sang Man ("KIM"). As explained below, SIM is a North Korean official employed by North Korea's Foreign Trade Bank (FTB). KIM is a North Korean national who is the chief executive officer (CEO) of "Chinyong," also known as "Jinyong IT Cooperation Company." Chinyong is subordinate to North Korea's Ministry of Defense (formerly known as the Ministry of the Peoples' Armed Forces), which OFAC added to its SDN list on June 1, 2017. Chinyong employs delegations of North Korean IT workers that operate in, among other countries, Russia and Laos. KIM acts as an intermediary between the North Korean IT workers and North Korea's FTB by sending funds from the North Korean IT workers to SIM.

51.     On April 24, 2023, OFAC added SIM to its SDN list. On May 23, 2023, OFAC added Chinyong and KIM to its SDN list.

52.     The Defendant Property are made up of funds generated by North Korean IT workers—some of whom were unwittingly employed by U.S.-based companies—and sent to KIM and/or SIM for the benefit of the North Korean government.

**B.  <u>Background Regarding SIM and KIM</u>**

53.     SIM Hyon Sop (SIM) is a North Korean national and FTB representative. At times, SIM worked for the FTB while living in Dubai, UAE. Within search warrant returns for an email account utilized by SIM ("SIM's Email Account 1"), law enforcement discovered SIM's UAE residency card. Law enforcement also found SIM's North Korean driver's license, which indicates that he is employed by FTB. SIM's UAE residency card and North Korean driver's license are depicted below:



54.     A review of search warrant returns for SIM's Email Account 1 and of search warrant returns for a second email account utilized by SIM ("SIM's Email Account 2") revealed emails between SIM and his money laundering co-conspirators (including other FTB officials) in which they discuss procurement and banking matters. These emails include information about, among other things, bills of lading, invoices, U.S. dollar loan agreements, fiat currency conversion

agreements, and SWIFT[6] payment confirmations. These emails confirm SIM's role as an FTB representative.

55. KIM is a North Korean national. He is the head of Chinyong and was formerly a representative of Korea Computer Center, a state-run IT research and development center.[7] Chinyong is subordinate to the Korea People's Army (KPA)[8] and is responsible for deploying dozens of North Korean IT workers to Dubai, Laos, Russia, and China. KIM is pictured below:



56. As previously stated, on May 23, 2023, OFAC designated KIM. According to OFAC's press release regarding the designation, KIM was a representative of Chinyong and was

---

[6] SWIFT stands for Society for Worldwide Interbank Financial Telecommunication. SWIFT payments are payment transactions using the SWIFT international payment network. This network is used to send or receive international electronic payments.

[7] On June 1, 2017, OFAC added Korea Computer Center (KCC) to its SDN list. According to OFAC's press release for the KCC designation, KCC obtained foreign currency for the UN- and U.S.-designated Munitions Industry Department, which is responsible for overseeing North Korea's ballistic missiles.

[8] On June 1, 2017, OFAC added the KPA to its SDN list pursuant to EO 13722. The KPA is the armed forces of North Korea and controlled by North Korea's supreme leader, KIM Jong Un.

designated for engaging in revenue generation for the Workers' Party of Korea (i.e., the ruling party of North Korea), which is also OFAC designated.

57.     According to publicly available business records from the Russian Federation, KIM established at least two companies in Vladivostok, Russia that are focused on software development. Those companies are Alis LLC and Alias LLC. The company registration records are depicted below:



58.     The FBI's investigation indicates that KIM—at times relevant to the money laundering described herein—was living in Vladivostok, Russia.

C.  **Overview Regarding the Movement of Funds from North Korean IT Workers to KIM and SIM**

59.     As previously stated, North Korea evades U.S. sanctions by deploying IT workers abroad. Those IT workers target private companies to gain employment and generate substantial revenue for the regime. Once they obtain employment, the North Korean IT workers ask to be paid in stablecoins that they then launder and send to North Korea's FTB via SIM. The North Korean IT workers prefer to be paid in stablecoins because stablecoins retain a consistent value, as opposed to other virtual currencies which fluctuate in price on a daily basis. Those fluctuations mean that the North Koreans could potentially lose the value and benefit of their labor. The North Korean IT workers also prefer stablecoins because they (and/or their money laundering co-conspirators) can more easily trade stablecoins for fiat currency via over-the-counter (OTC) traders (i.e., traders willing to engage in peer-to-peer transfers/swaps of one kind of virtual currency for another or virtual currency for fiat currency, rather than using conventional exchange platforms). Fiat currency is important to the North Koreans because it is more easily leveraged to buy goods for the benefit of North Korea.

60.     As is relevant for purposes of this civil forfeiture action, the FBI has learned that this laundering scheme involved moving funds from North Korean "IT Worker Payment Addresses" to "IT Worker Consolidation Addresses." In the context of this filing, IT Worker Payment Addresses are virtual currency addresses to which North Korean IT workers requested payment from their unwitting employees. IT Worker Consolidation Addresses are the virtual currency addresses that the North Koreans (and/or their money laundering co-conspirators) used to commingle IT worker earnings. All references herein to IT Worker Payment Addresses and IT

24

Worker Consolidation Addresses in this document are references to unhosted addresses that received funds tied to this North Korean money laundering conspiracy. Additionally, all unhosted addresses referenced herein and in Attachment A are unhosted addresses from which law enforcement seized funds and/or requested a freeze of funds because the funds were involved in and/or proceeds of this money laundering conspiracy. In other words, the unhosted addresses mentioned are some of *the* IT Worker Payment Addresses and *the* IT Worker Consolidation Addresses defined herein.

61.   Eventually, the North Korean IT workers (and/or their money laundering co-conspirators) sent the commingled funds from the IT Worker Payment Addresses and/or the IT Worker Consolidation Addresses to KIM via two Binance accounts (collectively, "KIM's Binance Accounts")[9] and/or to SIM via his virtual currency wallet 0x4F47Bc496083C727c5fbe3CE9CDf2B0f6496270c ("SIM's Wallet"), which was voluntarily frozen by Tether as noted above.[10]

62.   Notably, law enforcement's extensive blockchain tracing revealed that SIM's Wallet received nearly $24 million worth of various virtual currencies between August 22, 2021, and March 6, 2023, including 11,097,149 USDT. Further, based on blockchain analysis, as of early-March 2022, the vast majority of the 11,097,149 USDT (approximately 98%) came from KIM's Binance Accounts.

---

[9]   Law enforcement seized KIM's Binance Accounts pursuant to seizure warrant 22-sz-6. As explained above, that property is referred to herein as part of the March 2022 Seized Property.

[10]   Tether froze SIM's Wallet on March 6, 2023, meaning that SIM (and his co-conspirators) were no longer able to withdraw USDT from SIM's Wallet after that date.

**D. KIM's Binance Accounts Were Registered Using Fraudulent Identity Documents**

63.     According to records from Binance, a substantial portion of funds sent to SIM's Wallet came from KIM's Binance Accounts. KIM's Binance Accounts were established using two different sets of Russian identity documents, which are depicted below:

 

64.     Although KIM's Binance Accounts were established with Russian identity documents, Binance records indicate that (1) both accounts were accessed via the same electronic devices and (2) those electronic devices were set with Korean language preference settings, not Russian.

**E. SIM Saved KIM's Phone Number in His Contacts List**

65.     According to records from Binance, the phone number used to register one of KIM's Binance Accounts was Russia-based phone number +79510124209. Importantly, SIM had that phone number stored in his contacts folder as "Sang Man – Russian Federation." In other words, SIM had KIM Sang Man's phone number in his contacts list.

**F. KIM's Binance Accounts Received Funds Tied to North Korean IT Workers**

66.     KIM's Binance Accounts received funds from multiple IT Worker Payment Addresses and IT Worker Consolidation Addresses. The following are examples of the flow of illicit funds to KIM's Binance Accounts. These examples are not exhaustive. They are simply

meant to provide an overview of how these co-conspirators utilized KIM's Binance Accounts (and North Korean IT workers) to amass virtual currency for the North Korean government.

### a. North Korean IT Workers Employed by DeFi Company 1

67.     According to blockchain analysis and records from U.S.-based virtual currency exchanges, KIM's Binance Accounts received funds from VCE accounts controlled by U.S.-based companies involved in blockchain and DeFi development. For example, investigation revealed that a U.S.-based IT development company ("DeFi Company 1") sent USDC to two different IT Worker Payment Addresses (collectively, the "Two ITW Addresses"). The Two ITW Addresses then sent funds to KIM's Binance Accounts.

68.     Law enforcement interviewed DeFi Company 1's founder and learned that DeFi Company 1 had hired two remote IT workers, who were working as independent contractors, and who asked to be paid via the Two ITW Addresses. DeFi Company 1's founder also indicated to law enforcement that payment to those two employees was sent from DeFi Company 1's corporate account at Coinbase.

69.     Law enforcement reviewed DeFi Company 1's employment records related to the two above-referenced IT workers. Law enforcement learned the following about the first IT worker ("IT Worker-1"):

    a.  IT Worker-1 utilized fraudulent identity information on the W-9 form he submitted to DeFi Company 1. Specifically, the W-9 form indicated that IT Worker-1 was Joshua Palmer ("Palmer"); however, the social security number on the W-9 form belonged to a different U.S. citizen (i.e., that social security number was not tied to Palmer/IT Worker-1), and the physical address on the W-9 form was for a pizzeria, not a residence.

27

b.  IT Worker-1 listed an email account on Palmer/IT Worker-1's resume that was used to establish an account at Binance. That Binance account was registered in the name of Wong Shao Onn ("Onn's Binance Account"), using Malaysian identity documents. Records show that logins for Onn's Binance Account were almost exclusively from UAE-based IP addresses.

c.  Additionally, the selfie-style photograph used to create Onn's Binance Account was a picture of Palmer/IT Worker-1 (i.e., the person who worked at DeFi Company 1 and claimed to be Palmer/IT Worker-1). That photograph is depicted below.



d.  According to a publicly available posting on a U.S.-based freelance work platform, an individual utilizing the name Wong Shao Onn claimed to be a software developer located in the UAE. A screenshot of that profile page is depicted below.



e. The photograph above of Wong Shao Onn appears to be the same person who claimed to be Palmer/IT Worker-1 while working for DeFi Company 1.

f. According to blockchain analysis and records from Binance, the user of Onn's Binance Account sent funds directly to SIM's Wallet and directly to other IT Worker Payment Addresses that then sent funds to KIM's Binance Accounts.

70.    Law enforcement learned the following about the second IT worker ("IT Worker-2"):

a. In his application to work for DeFi Company 1, IT Worker-2 claimed to be Bram Chen ("Chen"). Chen was responsible for writing smart contracts.[11] According to Chen's resume, which he supplied to DeFi Company 1, Chen has been employed by several DeFi-centric companies.

b. Chen provided a Russia-based phone number on his resume.

c. Chen's publicly available profile information from a U.S.-based professional networking platform is depicted below:

---

[11]    A smart contract is a type of Ethereum account that can hold funds and can send/refund them based on certain conditions. In DeFi (decentralized finance), a smart contract essentially replaces the financial institution in the transaction.



71.     On the resume provided by Chen to DeFi Company 1, Chen listed an email account that was also used to register an account with Binance ("Chen's Binance Account"). Based on records from Binance, Chen's Binance Account sent funds directly to one of the IT Worker Consolidation Addresses used to commingle IT worker funds.

### b.  *North Korean IT Workers Employed by DeFi Company 2*

72.     According to blockchain analysis and records from Binance.US, DeFi Company 2, which is based in the U.S., sent funds to one of the IT Worker Payment Addresses that eventually transferred funds to KIM's Binance Accounts. According to DeFi Company 2's founder, those funds were payment to an individual named Alex Hong ("Hong"), who was hired to create a decentralized application (DApp) for DeFi Company 2. According to DeFi Company 2's founder, Hong initially claimed to be located in Australia. Subsequently, Hong claimed to be in Canada. DeFi Company 2's founder indicated that Hong was also employed by a London-based DeFi

company. Below is a screenshot from a publicly available profile for a user identified as Alex

Hong, who claimed to be in Canada and to be employed by the same London-based DeFi company:



### c. IT Workers Use Fraudulent Identity Documents to Establish VCE Accounts

73.     While investigating Palmer, Chen, and Hong, law enforcement identified VCE

accounts at multiple virtual currency exchanges that (1) were established using fraudulent

identification; and (2) were used to launder funds tied to IT Worker Payment Addresses, IT Worker

Consolidation Addresses, and KIM's Binance Accounts. For example:

    a.  **The Leech Accounts**[12]:

        i.  According to records provided by Binance, Coinbase, and Bittrex, the

           same email account was utilized to register accounts at all three

---

[12]     These accounts are referenced herein as the Leech Accounts because the actors associated with the Leech Accounts used names and other identifiers that incorporated the word "leech." For example, as explained below, the actors used the names ***LEE Ch***an and ***LEE Ch***ienhui, as well as the online identifiers "leech_dev" and "leech.developer@gmail.com."

exchanges. Those accounts are referred to herein as the "Binance Leech Account," the "Coinbase Leech Account," and the "Bittrex Leech Account," respectively, and the "Leech Accounts," collectively.

ii. According to records from Binance, the Binance Leech Account was accessed almost exclusively from Russian IP addresses, though nearly all devices accessing the account were set with English language preference.

iii. The Coinbase Leech Account was registered under the name Chienhui Lee, and the user provided a UK-based phone number.

iv. The Bittrex Leech Account was accessed from Russia-based IP addresses but was registered with the Singaporean identity document depicted below, in the name Karlo Lee Chan:



v. On a site for professional networking and career development, law enforcement identified a profile in the name ChienHui Lee ("Lee"), the same name used to open the Coinbase Leech Account. According to the profile information, Lee was a blockchain developer located in Canada. The networking profile indicated that Lee was employed by a U.S.-based DeFi company. A screenshot of that profile is depicted below:



**ChienHui Lee**

Blockchain Developer (Solidity / Typescript / Ethers / Web3)

Regina, Saskatchewan, Canada · 500+ connections

Asia Pacific University of Technology and Innovation (AP...

Join to Connect

vi. It appears from the Singapore identification card and the networking profile that Karlo Lee Chan and ChienHui Lee are the same person.

vii. The above indicates that the Leech Accounts are controlled by a person (or people) engaged in fraud. Specifically, the use of the same email, but with different names and geographic locations/IP address connections, indicates to me that the identity information used to open the Leech Accounts is fraudulent.

33

viii. Additionally, according to blockchain analysis and records from Binance and Bittrex, the Leech Accounts sent funds (including USDT and/or BTC) to IT Worker Payment Addresses and IT Worker Consolidation Addresses before those funds were sent to KIM's Binance Accounts.

ix. As previously stated, North Korean IT workers utilize a variety of means to gain employment and access to financial accounts, including the use of fraudulent identity information. The Leech/Lee persona is consistent with both the type of work sought (i.e., IT development jobs in the virtual currency space) and use of fraudulent information (i.e., false or fraudulently obtained identification information) to gain access to U.S.-based employment and U.S.-based financial services.

**b.  The Iurii Accounts**

i. According to records from Binance, Binance User ID 46842926 was registered under the name Iurii Takhtenkov (the "Binance Iurii Account"). The Binance Iurii Account was established with Russian KYC documents and was primarily accessed from UAE-based IP addresses. The Binance Iurii Account sent funds to IT Worker Consolidation Addresses. Below is a copy of the identification document used to register the Binance Iurii Account:



    ii.   According to records from Bittrex, the same email account used to open the Binance Iurii Account was also used to establish an account at Bittrex (the "Bittrex Iurii Account").

    iii.   According to records from the internet service provider, the email account used to register both the Binance Iurii Account and the Bittrex Iurii Account was linked by cookie to the email address bryan.cho@toptal.com,[13] indicating that the email accounts were accessed from the same device. According to a publicly available resume in the name of Bryan Cho ("Cho") on Toptal's website, Cho is a UAE-based blockchain developer. Notably, the Cho persona is consistent with both the type of work sought by North Korean IT

---

[13]    Toptal is a company that provides a freelancing platform for connecting businesses with software engineers, designers, finance experts, product managers, and project managers.

35

workers and the use of fraudulent information to gain access to U.S.-based financial services. A screenshot of Cho's profile is depicted below:



iv. According to blockchain analysis and records from Binance and Bittrex, the Binance Iurii Account and the Bittrex Iurii Account sent funds (including USDT and BTC) to IT Worker Payment Addresses and IT Worker Consolidation Addresses before those funds were sent to KIM's Binance Accounts.

### d. *Korean Language Preference for Binance Accounts*

74. According to records from Binance, several of the Binance accounts that sent funds to IT Worker Payment Addresses and IT Worker Consolidation Addresses were accessed via devices set with Korean language preference. The language preference for these accounts was inconsistent with the identity document information used to establish the accounts. It was also inconsistent with the geographical location information and IP addresses used to access the accounts. For example, according to records from Binance, User ID 41825291 was established in

the name Mark Anders Liljefors (the "Liljefors Binance Account") with the following Canadian

identity document:



75.    Although the Liljefors Binance Account was established with a Canadian identity

document, the Liljefors Binance Account was predominantly accessed from Russia-based IP

addresses. In addition, the majority of the devices used to access the account were set for Korean

language preference. The Liljefors Binance Account sent funds to IT Worker Consolidation

Addresses, which then sent funds to KIM's Binance Accounts.

76.    As previously stated, the above is an overview of this money laundering scheme.

During this ongoing investigation, law enforcement encountered many more accounts just like

them. In sum, law enforcement learned that these co-conspirators use fraudulent identity

documents and layered virtual currency transactions to cloud the source of funds, allowing

sanctioned North Korean entities to collect illicit proceeds. These money laundering tactics also

37

prevent U.S. financial institutions and employers from effectively implementing anti-money laundering controls to prevent violations of U.S. sanctions against North Korea.

**CONNECTING THE DEFENDANTS *IN REM* TO THE OVERALL SCHEME**

77.     As outlined above in paragraphs 2(a) through 2(h), the defendants *in rem* (the Defendant Property) include eight tranches of virtual currency that have either been seized and are in U.S. government wallets or have been frozen by Tether and await transfer to the U.S. government pursuant to this civil forfeiture action. The following paragraphs explain the connections between the eight tranches and the above-described laundering scheme. In sum, law enforcement seized SIM's Wallet, KIM's Binance Accounts, a Binance account believed to be controlled by SIM, and a Binance account that contained funds from IT Worker Payment Addresses. Law enforcement also seized unhosted addresses that are some of the IT Worker Payment Addresses and/or IT Worker Consolidation Addresses that received and contained funds tied to this money laundering conspiracy.

78.     Paragraph 2(a):

   a.   The March 2022 Seized Property (associated with paragraph 2(a) above) includes KIM's Binance Accounts (Binance User ID 81090004 and User ID 118543589) discussed in paragraphs 60 through 74. The March 2022 Seized Property also includes various types of virtual currency that were seized from unhosted virtual currency addresses. Those unhosted addresses are some of the IT Worker Payment Addresses and IT Worker Consolidation Addresses. The March 2022 Seized Property was seized during the execution of seizure warrant 22-sz-6.

79.     Paragraph 2(b):

38

a. The June 2022 Seized Property (associated with paragraph 2(b) above) includes various types of virtual currency that were seized from unhosted virtual currency addresses. Those unhosted addresses are some of the IT Worker Payment Addresses and IT Worker Consolidation Addresses. The June 2022 Seized Property also includes NFTs and ENS domain names that were used to launder proceeds from North Korean IT Workers. The June 2022 Seized Property was seized during the execution of seizure warrant 22-sz-13.

80. Paragraph 2(c):

a. The August 2022 Seized Property (associated with paragraph 2(c) above) includes two Binance accounts, User ID 369902286 and User ID 126474093. The August Seized Property was seized during the execution of seizure warrant 22-sz-18.

b. Regarding Binance User ID 369902286, blockchain analysis revealed that this account was used to send funds to, and receive funds from, SIM's Wallet. Specifically, between December 19, 2021, and September 1, 2022, Binance User ID 369902286 received Binance USD, as well as USDT and USDC on Binance Smart Chain from SIM's Wallet. At the time of those transfers, the funds were valued at approximately $1.45 million. Nearly all funds sent from SIM's Wallet to Binance User ID 369902286 were converted to USDT on the Ethereum blockchain and then sent back to SIM's Wallet. In other words, the funds were sent to Binance User ID 369902286 at Binance so that they could be converted to USDT via Binance's exchange platform, and then almost all of

that USDT was sent back to SIM's Wallet. These transactions do not appear to have any utility other than to launder funds.

c. Notably, a review of search warrant returns for an email account used by SIM revealed that he registered his account at a cloud service provider using a phone number ending in 1201. Binance User ID 369902286 was registered at Binance using the same phone number ending in 1201. Additionally, Binance User ID 369902286 was registered with a UAE Resident Identity Card in the name Rifas Kiyasdeen. According to search warrant returns from SIM's email account, SIM used the same identity documents in the name of Rifas Kiyasdeen to register an account with FedEx. In other words, SIM likely controlled Binance User ID 369902286.

d. Regarding Binance User ID 12647409, that Binance account received funds from IT Worker Payment Addresses.

81. Paragraph 2(d) and 2(e):

a. The September 22 Seized Property (associated with paragraph 2(d) above and seizure warrant 22-sz-19), as well as the USDT frozen on or about September 1, 2022 (associated with paragraph 2(e) above) includes USDC and USDT tokens seized from two unhosted virtual currency addresses, 0x815F335f976301f496167bfeF237f0622F92ac38 ("0x815F") and 0x81c4d8816b29147c542dDE87485608204690Acf2 ("0x81c4"). Those unhosted addresses are some of the IT Worker Consolidation Addresses.

b. Those two unhosted virtual currency addresses contained both USDC and USDT tokens. Blockchain analysis revealed that address 0x815F received

approximately 12,250 USDC from two of the IT Worker Payment Addresses. Address 0x815F also received approximately 367,550 USDT from IT Worker Consolidation Addresses and 10,000 USDT from one of the IT Worker Payment Addresses. According to blockchain analysis, 0x81c4 received approximately 158,122.85 USDC, on two separate blockchains, from at least ten IT Worker Payment Addresses. 0x81c4 also received approximately 54,574 USDT from at least four IT Worker Payment Addresses.

82.     Paragraph 2(f):

a.  Paragraph 2(f) relates to USDT that was voluntarily frozen by Tether on or about March 6, 2023, in unhosted virtual currency address 0x4F47Bc496083C727c5fbe3CE9CDf2B0f6496270c ("0x4F47"). Address 0x4F47 is SIM's Wallet. As described above, SIM's Wallet received approximately $10 million of USDT from KIM's Binance Accounts, which were funded in large part by proceeds from the North Korean IT workers who obtained employment from unwitting companies. *See* para. 60, 61, *infra.* SIM's Wallet also received funds directly from an IT worker's account. *See* para. 68(f) *infra.*

83.     Paragraph 2(g):

a.  Paragraph 2(g) relates to USDT that was voluntarily frozen by Tether on or about March 6, 2023, in unhosted virtual currency addresses 0x5707aA6944E357cEa1A25Ff991fB3A2E60268AB5 ("0x5707") and 0xB389B4B4a8a6E267CA0712321cdca5c856ef8A72 ("0xB389"). Those unhosted addresses are some of the IT Worker Consolidation Addresses.

41

b. 0x5707 was used to consolidate virtual currency, including USDT from North Korean IT Workers. For example, between June 2022 and March 2023, 0x5707 received approximately 4,577,810 USDT. It also received approximately 192,000 USDT from SIM's Wallet.

c. Finally, 0x5707 sent approximately 3.8 million USDT to addresses associated with a Chinese national named Lu Huaying ("LU"). LU operated as an OTC trader. OFAC added LU to its SDN list on or about December 17, 2024. According to OFAC, LU was designated for working through a UAE-based front company to facilitate money laundering and virtual currency conversion services that funneled illicit proceeds to Pyongyang. The network was led by SIM.

d. When Tether froze 0x5707, it had a balance (and still does) of approximately 200,603 USDT.

e. 0xB389 was used to consolidate virtual currency, including USDT from North Korean IT workers. Between October 2022 and March 2023, 0xB389 received approximately 2,964,101 USDT.

f. In October 2022, 0xB389 sent approximately 43,200 USDT to an account at Binance controlled by SIM.

g. 0xB389 also sent approximately 1.7 million USDT to address 0x511b9ED0b7eF9dfad519f398Fdfbdf6Af8356780 ("OTC 1"). According to records from FTX (a now-defunct VCE), OTC 1 is tied to an FTX account under LU's name. LU opened that FTX account using a UAE residency card.

h. 0xB389 also sent approximately 556,000 USDT to 0x2ad9790b5116ce19b9cc59C7982A64dF0FeA84bc ("OTC 2"). OTC 2 received approximately 12.7 million USDT from SIM's Wallet. OTC 2 received a total of 30,592,211 USDT. Of that amount, OTC 2 sent approximately 21 million USDT to LU's FTX account mentioned above.

i. When Tether froze 0xB389, it had a balance (and still does) of approximately 464,669 USDT.

84. Paragraph 2(h):

a. Paragraph 2(h) relates to USDT voluntarily frozen by Tether on or about April 1, 2023, in unhosted virtual currency addresses 0x15824de78A61a8B493CCd8A48e58463536B17028 ("0x1582"), 0x6E2F0deAB1C358547b353342524489e32640D530 ("0x6E2F"), 0x3E24F610639e105173003EF1c47dC4DbAa33f8D7 ("0x3E24"), and 0x1c097e02bCd6cD69946663ace4bc0B115e256bAc ("0x1c09"). Those unhosted addresses are some of the IT Worker Consolidation Addresses.

b. 0x5707 and 0xB389 (associated with paragraph 2(g)) each received assets from a series of four other IT Worker Consolidation Addresses. After Tether froze addresses 0x5707 and 0xB389, the four IT Worker Consolidation Addresses sent ETH to four new IT Worker Consolidation Addresses, providing the first gas[14] into 0x1582, 0x6E2F, 0x3E24, and 0x1c09. These new IT Worker Consolidation Addresses began receiving virtual currency from dozens of

---

[14] As explained above, "gas" is a term used to describe the funds required to pay for a transaction on certain blockchains, including the Ethereum network.

unhosted addresses, which were previously sending to 0x5707 and 0xB389. In other words, these co-conspirators began using these four addresses as their new IT Worker Consolidation Addresses for illicit funds.

c. When Tether froze 0x1582, 0x6E2F, 0x3E24, and 0x1c09, they contained approximately 32,163 USDT, 84,814 USDT, 13,300 USDT, and 46,799 USDT, respectively.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

May XX, 2025
Washington, D.C.

JEANINE FERRIS PIRRO
Interim United States Attorney

*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
Assistant United States Attorney
Asset Forfeiture Coordinator
Texas Bar Number 24103294
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Telephone: 202-252-6765

44

Email: rick.blaylock.jr@usdoj.gov

Jessica C. Peck
New York Bar No. 5188248
Trial Attorney
U.S. Department of Justice, Criminal Division
Computer Crime and Intellectual Property Section
1301 New York Avenue, N.W., Suite 600
Washington, D.C. 20005
(202) 514-1026 (main line)
jessica.peck@usdoj.gov

Gregory Jon Nicosia, Jr.
D.C. Bar No. 1033923
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice
D.C. Bar No. 1033923
950 Pennsylvania Avenue NW
Washington, D.C.  20530
Telephone: 202-353-4273
Email: Gregory.Nicosia@usdoj.gov

## VERIFICATION

I, Christopher Wong, a Supervisory Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and other information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 23rd day of May 2025.

_____
Christopher Wong
Supervisory Special Agent
Federal Bureau of Investigation

## ATTACHMENT A

1.      Virtual currency seized from unhosted virtual currency addresses and two accounts

at Binance (a virtual currency exchange or "VCE") during the execution of seizure warrant 22-sz-

6:

| Unhosted Address Assets | Amount |
| --- | --- |
| BTC | 0.0088168900 |
| LTC | 0.1277800100 |
| ETH | 521.8746883372 |
| STARL | 29692425251.2506000000 |
| ENS | 9356.0348458065 |
| USDT | 57108.4877230000 |
| DBUY | 3496980.1704557400 |
| KUMA | 138831744207.6800000000 |
| USDC | 11408.4319970000 |
| CRV | 2701.7377850068 |
| DAI | 3547.2432407695 |
| SMI | 239599819.0021540000 |
| PERP | 4.6601186800 |
| GTC | 0.0000449293 |
| BNB | 1.6022037064 |
| BUSD | 6750.0000000000 |
| ABGRT | 0.5760000000 |
| MATIC | 9.9860082833 |
| FTM | 16.8386154779 |

| Binance Account 81090004: | |
| --- | --- |
| BNB | 0.0000124000 |
| BTC | 0.0000073300 |
| ETH | 145.7000897500 |
| USDT | 1484636.8067804600 |
| SAND | 14082.9700000000 |
| USDC | 0.7433070000 |
| BUSD | 0.4068787400 |

| Binance Account 118543589: | |
| --- | --- |
| BNB | 0.0000521300 |
| ETH | 0.0000350000 |
| USDT | 2411417.7593996300 |

The above-listed assets were seized from the following unhosted addresses. These unhosted addresses are some of the "IT Worker Payment Addresses" and "IT Worker Consolidation Addresses," as defined in the accompanying complaint.

- bc1qrzxvnl8lr4te4hgmz2e0nn97ypq2nyvvev2ges
- LKm8pewKd68MN9Rk6mAeNqSNFovvsLtCz8
- 0x7066D17C140a64e770c7286DeF08C611a9cC78d4
- 0xb41d7De2AF854C17965C277fEb5B55ECc596Ccd8
- 0xb6bb7BE73d453ed6D1141A08E444DaC1356F0766
- 0x0A9Afe0b6E04Fd212aD7547e9798E0A7Ca2EE370
- 0x6c90b98b8C5C41D615300b9ed774F85b29078CA2
- 0xfCe7C3c7717F93389577972485142e928F231dad
- 0x294662cca316061A5942c7Be3191b96318606781
- 0xd4004F07D7b746103F2D9B4e5B5A540864526BEc
- 0xa7D2cF62487AA87dDba211D1e8DC7259BE2a9A70
- 0x5A297599c4bD1c3ef00b277f8a7369cb5b9Bd157
- 0xA6Ee3542b6ab3115Be7E6445268161E0293ed7cF
- 0xFe035df35C6fE5578EdE6267883638DB7634DE82
- 0x95d179FB2f017FaadD0013F730d949ac0aC739B6
- 0x50e7f5d0f2bA91E002c7094d844D3A8fF187e204
- 0x1690c80F392a8ba83E2f755b1E53Dd4503738698
- 0x6A643519520b875BD9CE7E882c218A6E38d8Dc41
- 0x3269C4C05356E511BC447DA5C722e63f682243C9
- 0x67624c4C72B8989143510f9Ac09A58007bf79676
- 0xdd344126c52478E8e1e7aad583E2332567Afd730
- 0x53C64EC686F8235954d1dF08cD975C337A8f24B2
- 0xa09a934BA4440CFCbD0C2937a263351926919565
- 0xf3F2e9391b440526D538E904C0252421eeB4B61C

2.      Virtual currency seized from unhosted virtual currency addresses, NFTs, and ENS domain names during the execution of seizure warrant 22-sz-13:

| Unhosted Address Assets | Amount |
| --- | --- |
| Punk Vault (NFTX) | 0.135126 |
| USD Coin (USDC) | 1,668.782899 |
| SafeMoon Inu (SMI) | 264,222,552.086639 |
| UniCrypt (UNCX) | 3.000000 |
| Ethereum (ETH) | 0.192765 |
| Tether (USDT) | 77.122725 |

48

Project Inverse (XIV)                                      3,000.000000

**NFTs:**
"Tender Morphism" 7/7
Gurlz Go Wildd #43
"Sweet Symphony" 10/10
Invisible Scissors #15
Invisible Scissors #86
Invisible Scissors #35

**ENS Domain Names:**
vhurryharry.eth
halfmooneye.eth

The above-listed assets were seized from the following unhosted addresses. These unhosted addresses are some of the "IT Worker Payment Addresses" and "IT Worker Consolidation Addresses," as defined in the accompanying complaint.

- 0x44A9DaC239201DeF01B55dC8122cE1Dc8BD55C72
- 0x864C8ef839DD3859820BC6BcE450Aee43F938178
- 0x21A2CF2b1E84d9E9a38389F797F6087d94Ed3d86
- 0xf7bC1F442d436AFe5754b565bff030c281c9Aa90
- 0x3709d736F2615aE8e2f429e63aA3e1494b353D94
- 0xA184f953376A3c76A72A37849591ac6D8e148083
- 0xF17Cd87f477acE0BBb6Fe452bB50619c42AB4D97
- 0x7492FbBb52e58A0c3E1315f9b77a6b24e6414835

3.    Virtual currency seized from two accounts at Binance during the execution of seizure warrant 22-sz-18:

**Binance Account 369902286:**

| Asset | Amount |
|-------|--------|
| BTC | 1.047995 |
| USDT | 200 |

**Binance Account 126474093:**

| Asset | Amount |
|-------|--------|
| USDT | 135 |

49

4. Virtual currency in the form of USDC frozen and U.S. dollars seized in connection with unhosted virtual currency addresses 0x815F335f976301f496167bfeF237f0622F92ac38 and 0x81c4d8816b29147c542dDE87485608204690Acf2 during the execution of seizure warrant 22-sz-19, which are some of the IT Worker Consolidation Addresses, as defined in the accompanying complaint:

| Asset | Amount |
| --- | --- |
| USDC on Ethereum | 187,035.41 |
| USDC on Avalanche | 31,584.20 |
| USDC on Ethereum | 12,262.25 |

5. Virtual currency in the form of USDT that was voluntarily frozen by Tether on or about September 1, 2022, in unhosted virtual currency addresses 0x815F335f976301f496167bfeF237f0622F92ac38 and 0x81c4d8816b29147c542dDE87485608204690Acf2, which are some of the IT Worker Consolidation Addresses, as defined in the accompanying complaint:

| Asset | Amount |
| --- | --- |
| USDT on Ethereum | 145,491.97 |
| USDT on Ethereum | 387,550.90 |

6. USDT that was voluntarily frozen by Tether on or about March 6, 2023, in unhosted virtual currency address 0x4F47Bc496083C727c5fbe3CE9CDf2B0f6496270c, which is SIM's Wallet, as defined in the accompanying complaint.

7. USDT that was voluntarily frozen by Tether on or about March 6, 2023, in unhosted virtual currency addresses 0x5707aA6944E357cEa1A25Ff991fB3A2E60268AB5 and

0xB389B4B4a8a6E267CA0712321cdca5c856ef8A72, which are some of the IT Worker Consolidation Addresses, as defined in the accompanying complaint.

8.      USDT that was voluntarily frozen by Tether on or about April 1, 2023, in unhosted virtual currency addresses 0x15824de78A61a8B493CCd8A48e58463536B17028, 0x6E2F0deAB1C358547b353342524489e32640D530, 0x3E24F610639e105173003EF1c47dC4DbAa33f8D7, and 0x1c097e02bCd6cD69946663ace4bc0B115e256bAc, which are some of the IT Worker Consolidation Addresses, as defined in the accompanying complaint.

# CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | VIRTUAL CURRENCY ASSOCIATED WITH NORTH KOREAN IT WORKER MONEY LAUNDERING AND SANCTIONS EVASION CONSPIRACIES |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Rick Blaylock, Jr. United States Attorney's Office 601 D Street, N.W., Washington, D.C. 20530 (202) 252-6765 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( )1 | ( )1 | Incorporated or Principal Place of Business in This State | ( )4 | ( )4 |
| Citizen of Another State | ( )2 | ( )2 | Incorporated and Principal Place of Business in Another State | ( )5 | ( )5 |
| Citizen or Subject of a Foreign Country | ( )3 | ( )3 | Foreign Nation | ( )6 | ( )6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

- (●) **A. Antitrust**
  - ☐ 410 Antitrust

- ( ) **B. Personal Injury/ Malpractice**
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☐ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - 345 Marine Product Liability
  - 350 Motor Vehicle
  - 355 Motor Vehicle Product Liability
  - 360 Other Personal Injury
  - 362 Medical Malpractice
  - 365 Product Liability
  - 367 Health Care/Pharmaceutical Personal Injury Product Liability
  - 368 Asbestos Product Liability

- ( ) **C. Administrative Agency Review**
  - ☐ 151 Medicare Act

  **Social Security**
  - ☐ 861 HIA (1395ff)
  - ☐ 862 Black Lung (923)
  - 863 DIWC/DIWW (405(g))
  - 864 SSID Title XVI
  - 865 RSI (405(g))

  **Other Statutes**
  - 891 Agricultural Acts
  - 893 Environmental Matters
  - 890 Other Statutory Actions (If Administrative Agency is Involved)

- ( ) **D. Temporary Restraining Order/Preliminary Injunction**

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

- ( ) **E. General Civil (Other)** OR ( ) **F. Pro Se General Civil**

**Real Property**
- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent, Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

**Personal Property**
- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

**Bankruptcy**
- 422 Appeal 27 USC 158
- 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- 535 Death Penalty
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Conditions
- 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- 820 Copyrights
- 830 Patent
- 835 Patent – Abbreviated New Drug Application
- 840 Trademark
- 880 Defend Trade Secrets Act of 2016 (DTSA)

**Federal Tax Suits**
- 870 Taxes (US plaintiff or defendant)
- 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- 625 Drug Related Seizure of Property 21 USC 881
- 690 Other

**Other Statutes**
- 375 False Claims Act
- 376 Qui Tam (31 USC 3729(a))
- 400 State Reapportionment
- 430 Banks & Banking
- 450 Commerce/ICC Rates/etc
- 460 Deportation
- 462 Naturalization Application

- 465 Other Immigration Actions
- 470 Racketeer Influenced & Corrupt Organization
- 480 Consumer Credit
- 485 Telephone Consumer Protection Act (TCPA)
- 490 Cable/Satellite TV
- 850 Securities/Commodities/ Exchange
- 896 Arbitration
- 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- 950 Constitutionality of State Statutes
- 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| **530 Habeas Corpus – General** **510 Motion/Vacate Sentence** **463 Habeas Corpus – Alien Detainee** | **442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)** *(If pro se, select this deck)* | **895 Freedom of Information Act** **890 Other Statutory Actions (if Privacy Act)** *(If pro se, select this deck)* | **152 Recovery of Defaulted Student Loan (excluding veterans)** |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| **710 Fair Labor Standards Act** **720 Labor/Mgmt. Relations** **740 Labor Railway Act** **751 Family and Medical Leave Act** **790 Other Labor Litigation** **791 Empl. Ret. Inc. Security Act** | **441 Voting (if not Voting Rights Act)** **443 Housing/Accommodations** **440 Other Civil Rights** **445 Americans w/Disabilities – Employment** **446 Americans w/Disabilities – Other** **448 Education** | **110 Insurance** **120 Marine** **130 Miller Act** **140 Negotiable Instrument** **150 Recovery of Overpayment & Enforcement of Judgment** **153 Recovery of Overpayment of Veteran's Benefits** **160 Stockholder's Suits** **190 Other Contracts** **195 Contract Product Liability** **196 Franchise** | **441 Civil Rights – Voting (if Voting Rights Act)** |

**V. ORIGIN**

● **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi-district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**   ○ **8 Multi-district Litigation – Direct File**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C)

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23   **DEMAND $**   **JURY DEMAND:**   Check YES only if demanded in complaint   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form

DATE: _____6/5/2025_____   SIGNATURE OF ATTORNEY OF RECORD _____/s/ Rick Blaylock_____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.** CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.** CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.** CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.** RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.